1  CHANEL KATIRAIE, Esq. SBN 315825
2  AARON G. FILLER, Esq. SBN 302956
   Tensor Law, P.C.
3  2716 Ocean Park Blvd, #3082
   Santa Monica, California 90405
4  Tel: (310) 450-9689
   Fax:  (310) 496-3176
5
6  Attorneys for Plaintiff
     Tensor Law P.C.
7

8
## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| TENSOR LAW P.C., a California Corporation, | Case No. |
| Plaintiff, | Assigned for all purposes to: |
| vs. | |
| MICHAEL F. RUBIN, an individual; HARVEY WEINSTEIN, an individual; THE WEINSTEIN COMPANY LLC, a Delaware LLC; K2 INTELLIGENCE LLC, a Delaware LLC; LINDA FAIRSTEIN, an individual; BC STRATEGY UK LTD, a UK Limited Company; and DOES 1-50 | **VERIFIED FIRST AMENDED COMPLAINT FOR:**<br><br>1. **TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP**<br><br>2. **TORTIOUS INTERFERENCE WITH A PROSPECTIVE ECONOMIC ADVANTAGE** |
| Defendants. | 3. **PRACTICING LAW WITHOUT LICENSE – VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONAL CODE §6126**<br><br>**JURY TRIAL DEMANDED**<br><br>Action Filed: February 20, 2018<br>CMC:<br>     Location:<br>     Time:<br>Trial Date: |

-1-

VERIFIED COMPLAINT of Tensor Law P.C. vs. Michael Rubin, Harvey WEINSTEIN, et al

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................... 10

II. PARTIES ............................................................................................................... 16

III. JURISDICTION, VENUE & CONFLICT OF LAW ANALYSIS ................... 21
    1) Events Underlying the Litigation Took Place in California ............................ 21
    2) Specific Personal Jurisdiction Over Defendant Michael F. Rubin is Shown to Be Valid............ 22
    3) Location and Headquarters of the Parties are Such That Complete Diversity is Established and Diversity Subject Matter Jurisdiction Is Demonstrated ............................ 24
    4) Choice of Law Is Appropriately California Law as to the Contract Issues Based on Lex Loci Contractus and Lex Loci Solutionis Principles ............................ 26
    5) Choice of Law Is Appropriately California Law as to the Tort Issues Based on a Governmental Interest Analysis............................ 26

IV. FACTUAL ALLEGATIONS............................................................................... 29
    A. Events Leading To Client De La Huerta's Causes of Action Against WEINSTEIN and THE WEINSTEIN COMPANY ............................ 29
        1) Initial Assault on December 7, 2010 ............................ 30
        2) Corroboration of First Assault............................ 32
        3) Second assault on December 23, 2010 ............................ 33
        4) Event in Los Angeles ............................ 34
        5) Post Assault Retaliation by WEINSTEIN Against De La Huerta to Punish Her for Her Condemnation of His Rapes ............................ 35
        6) Legal Jeopardy Is Attached to THE WEINSTEIN COMPANY as well as to WEINSTEIN so that Both Were Motivated to Try to Undermine Efforts by Victims to Achieve Justice............................ 35
    B. Events Leading to DEFENDANTS' Liability In the Current Action ............................ 36
    C. Actions Of RUBIN to Attempt to Force a Waiver of De La Huerta's Patient-Psychotherapist Privilege as to Communications with SueAnne Piliero, PhD............................ 39
        1) At the Time of RUBIN's Interference TLPC Was In The Midst of Pursuing a Critical Emergency Action to Defend De La Huerta's Extremely Important Privacy Interests............................ 39
        2) RUBIN Initially Planned to Meet De La Huerta in Spain on November 12 to Discuss Her Case AFTER She Had Reviewed Her Records with Counsel. ............................ 42
        3) Rubin Decides to Surreptitiously Intervene and Intercept a Physical Copy of the Records ... 42
    D. Solicitation of A Represented Client By Tortious Means Voids Privilege ............................ 48
        1) Solicitation of Representation or Providing a Second Opinion Violates Professional Ethics if the Communication Contains False Information ............................ 48
        4) RUBIN's Advice Against Reactive and Affirmative Provision of General Case Information to Media Resulted in Additional Burden and Conflict............................ 51
    E. A Nefarious Purpose Is Provable By The Steps Taken by RUBIN ............................ 53
        1) No Attorney Client Privilege Arises From an Attorney's Contacts With an Opposing Client.. 53
        2) Lacking Any Attorney-Client Privilege Could Not Obtain a Copy of De La Huerta's Records Without Waiving Her Patient-Psychotherapist Privilege............................ 54
        3) Even to Render a Second Opinion – a Full Review of the Case File Was Required............................ 54
        4) Initial Investigation of RUBIN by Filler............................ 55
        5) Summary of Evidence of Actions by RUBIN Against De La Huerta's Chosen Course to Advance the WEINSTEIN Criminal Complaint............................ 57
    F. Destruction of Evidence by The Weinstein Company Warrants a Default Judgment............................ 58

V. FIRST CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP ............................ 61
    A. An Actual Valid Contract Existed ............................ 62

B. DEFENDANTS Had Knowledge of the Contract ........................................................ 63
C. DEFENDANTS Engaged In Specific Intentional Acts Intended To Disrupt And Interfere
With The Performance Of The Contract By FILLER And By TENSOR LAW P.C. ...................... 65
D. The Intentional Acts of DEFENDANTS were Wrongful And Unjustified ............................... 66
   1) No Competition Privilege Should Apply ..................................................... 67
   2) Wrongful and Unjustified Advice as to an Urgent Need to Terminate All Representation ...... 70
   3) RUBIN'S Plan to Create a Devastating and Irremediable Waiver of De La Huerta's Patient-
   Psychotherapist privilege. ......................................................................... 72
   4) The Wrongful Nature of RUBIN's Actions to Cause Waiver of Privilege ......................... 74
   5) Litigation Privilege Does Not Apply Because It Does Not Protect Statements to Third Parties
   Not Involved in the Litigation, Nor Does It Protect Certain Statements to the Press .................... 77
   6) Neither Litigation Privilege nor True and Nor and Fair & True Reporting Privilege Protects
   RUBIN's False and Wrongful Statements to Media ................................................. 78
E) RUBIN'S Actions Have Resulted In Severe or Negatively Dispositive Interference with
Progress Towards Indictment of WEINSTEIN .......................................................... 79
   1) An Actual Disruption is Alleged Which Made The Necessary Work More Burdensome to
   Perform ............................................................................................ 79
   2) This Was Not an At-Will Contract at the Time It Was Disrupted .................................. 84
F) RUBIN's Actions Resulted in a Break in Contract ................................................... 85
   1) Causation is Readily established for Making the Objective of Obtaining an Indictment of
   WEINSTEIN More Difficult as Well as Less Likely ................................................. 85
   2) The Amount of Pecuniary Damages is Susceptible to Being Accurately Established ............. 87
G. Direction by an Undisclosed Principal to Interfere with Contractual Relations ................. 90
   1) Allegation of Undisclosed Principal Status for WEINSTEIN and/or THE WEINSTEIN
   COMPANY ......................................................................................... 90
   2) The Existence of Agency Can Be Implied By Conduct ........................................... 91
H. Summary As To Intentional Interference With Contractual Relations ............................. 93
I. Exemption and Immunity: Anti-SLAPP Special Motion to Strike Under Cal CCP §425.16 .. 93

VI. SECOND CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH A PROSPECTIVE
ECONOMIC ADVANTAGE ............................................................................ 94

VII. THIRD CAUSE OF ACTION: PRACTICING LAW WITHOUT A LICENSE – VIOLATION
OF CAL. BUSINESS & PROFESSIONAL CODE §6126 ............................................. 95

VIII. PRAYER FOR RELIEF ............................................................................. 96

## TABLE OF AUTHORITIES

**CASES**

*Advantacare Health Partners, LP v. Access IV*,
   No. C 03-04496 JF, 2004 WL 1837997 at *5 (N.D.Cal. Aug.17, 2004) ......................... 59

*Altera Corp. v. Clear Logic, Inc.*,
   424 F.3d 1079 (9th Cir. 2005) ....................................................................... 64

*American Master Lease LLC v. Idanta Patners LTD*,
   225 Cal.App.4th 1451 (2014) ....................................................................... 89

*Anheuser- Busch, Inc. v. Natural Beverage Distributors*,
   69 F.3d 337 (9th Cir.1995) .......................................................................... 59

VERIFIED COMPLAINT of Tensor Law P.C. vs. Michael Rubin, Harvey WEINSTEIN, et al

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd., supra,*
   7 Cal.4th 503 (1994) ................................................................. 89

*Argentieri v. Zuckerberg,*
   8 Cal.App.5th 768 (2017)........................................................... 78

*Bancroft and Masters v. Augusta National Inc.,*
   223 F.3d 1082 (9th Cir., 2000).................................................. 22

*Bank of New York v. Fremont General*
   523 F.3d 902 (9th Circuit 2008)................................................ 85

*Benasra v. Mitchell Silberberg & Knupp LLC,*
   123 Cal.App.4th 1179 (2004)...................................................... 93

*Bergtholdt v. Porter Bros Co.*
   14 Cal. 681 (1896) ...................................................................... 91

*Brady v. Maryland,*
   373 U.S. 83 (1963)....................................................................... 41

*Buckaloo, v. Johnson supra,*
   14 Cal.3d 815 (1975)................................................................... 83

*Builders Corporation of America v. United States*
   148 F.Supp. 482 (N.D.Cal.1957) .............................................. 83

*Calder v. Jones*
   465 U.S. 783 (1984).................................................................... 22

*California Back Specialists Medical Group v. Rand,*
   160 Cal.App.41th 1032 (2008) .................................................. 93

*Cedars Sinai Medical Center v. Superior Court,*
   18 Cal.4th 1 (1998) ..................................................................... 57

*Centurion Capital Corp v. Guarino*
   35 Misc.3d 1219(A) NY Civ, (2012) ......................................... 69

*Contra Costa County Title Co. v. Waloff,*
   184 Cal.App.2d 59 (1960)........................................................... 88

*Coretronic Corporation v. Cozen O'Connor,*
   192 Cal.App.4th 1381, 1392 (2011)........................................... 93

*Cybersell, Inc. v. Cybersell, Inc.,*
   130 F.3d 414 (9th Cir.1997)........................................................ 22

-4-

*Del E. Webb Corporation v. Structural Materials Co.*,
    123 Cal.App.3d 593 (1981)........................................................................... 29

*Di Loreto v. Shumake*
    38 Cal.App.4th 35 (1995) ............................................................................ 87

*Estate of Williamson*
    150 Cal.App.2d 334 (1957)........................................................................... 89

*Filbin v. Fitzgerald*
    211 Cal.App.4[th] 154 (2012).......................................................................... 69

*Flatt v. Superior Court*
    9 Cal.4[th] 275 (1995) ................................................................................... 53

*Franklin v. Dynamic Details, Inc.*,
    116 Cal.App.4th 375,  (2004) ....................................................................... 85

*Garret v. Taylor*,
    Cro. Jac. 567, 79 Eng. Rep. 485 (Kings Bench 1620) ...................................... 66

*General Accident Fire & Life Assurance Corp. v. North American Systems, Inc.*,
    216 A.D.2d 725  (NY Appellate Division, 1995) ............................................. 69

*Halaco Eng'g Co. v. Costle*,
    843 F.2d 376 (9th Cir.1988)........................................................................... 58

*Hertz Corp v. Friend*,
    559 US 77 (2010) ........................................................................................ 24

*IMO Industries, Inc. v. Kiekert AG*
    155 F.3d 254 (3rd Cir. 1998) ........................................................................ 23

*In re Napster, Inc. Copyright Litigation*,
    462 F.Supp.2d 1060 (9th Cir., 2006) ............................................................ 58

*In re Sealed Case*,
    116 F.3d 550 (D.C. Cir., 1997). .................................................................... 73

*Joan Hansen and Co. Inc v. Everlast Worlds Boxing Headquarters*,
    296 A.D.2d 103 (2002) ................................................................................ 28

*Klinger v. Modesto Fruit Co.*
    107 Cal.App 97 (1930).................................................................................. 17

*Krin v. Lenox Hill Hosp.*,
    88 A.D.3d 597 (2011) .................................................................................. 57

VERIFIED COMPLAINT of Tensor Law P.C. vs. Michael Rubin, Harvey WEINSTEIN, et al

*Kronisch v. United States*
        150 F.3d 112 (2nd Cir., 1998). ........................................................................ 58

*Lipman v. Brisbane Elementary Sch. Dist.,*
        55 Cal.2d 224 (1961) ...................................................................................... 79

*Luce v. Sutton*
        115 Cal.App.2d 428 (1953)............................................................................. 17

*Manor Investment Co. v. F.W. Woolworth Co.*
        159 Cal. App. 3d 586 (1984)........................................................................... 80

*McGhee v. Arabian American Oil Company, supra,*
        871 F.2d 1412, 9th Cir. 1989 ......................................................................... 27

*Metropolitan Life Insurance Co. v. Neaves,*
        912 F.2d 1062,  (9th Cir. 1990)...................................................................... 23

*Michelson v. Hamada*
        29 Cal.App.4th 1566 (1994)............................................................................ 91

*Mitchell v. Gonzales,*
        54 Cal.3d 1041 (1991) ............................................................................. 85, 86

*NBT Bancorp, Inc v. Fleet/Norstar Financial Group, Inc.,*
        159 A.D.2d 902 (1990) ................................................................................... 27

*Nelson v. Kellogg,*
        `162 Cal. 621 (1912) ....................................................................................... 88

*Offshore Rental Co. v. Continental Oil Co.,*
        22 Cal.3d  157 (1978) ..................................................................................... 27

*Okorie v. Los Angeles Unified School District,*
        14 Cal.App.5th 574 (2017).............................................................................. 93

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*
        50 Cal. 3d 1118, 1126, (1990) ........................................................... 61, 80, 83

*Panavision Int'l, L.P. v. Toeppen,*
        141 F.3d 1316 (9th Cir.1998)......................................................................... 23

*Patterson v. Dominos Pizza LLC*
        60 Cal.4th 474 (2014). ................................................................................... 17

*Pavlovich v. Superior Court,*
        29 Cal.4th 262 (2002) ..................................................................................... 22

VERIFIED COMPLAINT of Tensor Law P.C. vs. Michael Rubin, Harvey WEINSTEIN, et al

*People v. Caldwell,*
    36 Cal.3d 210 (1984) ................................................. 85

*Pollack v. Lytle*
    120 Cal.App.3d 931 (1981)................................... 29, 91

*Popescu v. Apple Inc.,*
    1 Cal.App.5th 39 (2016)........................................... 28

*Prentice v. North American Title Guaranty Corp,*
    59 Cal. 2d 618 (1963) .............................................. 89

*Quelimane Co. v Stewart Title Guaranty Co.,*
    19 Cal. 4th 26 (1998) .......................................... 60, 65

*Rad Advertising Inc. v. United Footwear Organization, Inc.,*
    154 A.D.2d 309 (1989) ............................................. 27

*Ramona Manor Convalescent v. Care Enterprises,*
    177 Cal.App.3d 1120 (1986)..................................... 63

*Reeves v. Hanlon*
    33 Cal.4th 1140 (2004) ........................................ 65, 83

*Rutherford v. Owens-Illinois, Inc.,*
    16 Cal.4th 953, (1997) ............................................. 85

*San Francisco Design Center Associates v. Portman Companies,*
    41 Cal.App.4th 29 (1995)......................................... 67

*Savage v. Pacific Gas & Electric Co.,*
    21 Cal App 4th 434 (1993)........................................ 66

*Schnier v. Percival*
    83 Cal.App 470 (1927)............................................. 17

*Scholastic Book Clubs Inc. v. State Bd. Of Equalization*
    207 Cal.App.3d 734 (1989)....................................... 91

*Seaman's Direct Buying Service, Inc. v. Standard Oil Co.*
    36 Cal. 3d 752 (1984) ......................................... 28, 79

*Sebastian International v. Russolillo*
    162 F.Supp.2d 1198 (C.D. Cal 2001) .................. 63, 64, 79

*Shamblin v. Berge,*
    166 Cal. App. 3d 118 (1985)) ................................... 79

*Silberg v. Anderson,*
     50 Cal.3d 205 (1990) ........................................................................ 78

*Smith v. Schuttpelz*
     1 Cal.2d 158 (1934) .......................................................................... 91

*Sole Energy Company et al v. Petrominerals Corporation et al,*
     128 Cal.App.4th 212 ......................................................................... 87

*Speegle v. Board of Fire Underwriters*
     29 Cal.2d 34 (1946) .......................................................................... 83

*Stevens v. Chisholm,*
     179 Cal. 557 (1919) .......................................................................... 88

*Susan S. v. Israels,*
     55 Cal.App.4th 1290 (1997)............................................................... 77

*Tate v. Canonica,*
     180 Cal.App.2d 898 (1960)................................................................ 85

*Thayer v. Pacific Elec. Ry. Co.*
     55 Cal.2d 430 (1961) .................................................................. 28, 91

*Tourgeman v. Nelson & Kennard*
     222 Cal.App.4th 1447 (2014).............................................................. 93

*Tucci v. Club Mediterranee, S.A.,*
     89 Cal.App.4th 180 (2001)................................................................. 27

*U.S. Fid. & Guar. Co. v. Am. Employer's Ins. Co.,*
     159 Cal.App.3d 277 (1984)................................................................ 85

*Valley Engineers, Inc. v. Electric Eng'g Co.,*
     158 F.3d 1051 (9th Cir.1998)............................................................. 59

*Weiner v. City of Los Angeles,*
     68 Cal.2d 697 (1968) ........................................................................ 94

*Wise v. Thrifty Payless Inc.*
     83 Cal.App.4th 1296 (2000)............................................................... 77

*Wyle v. R.J. Reynolds Tobacco Co.,*
     709 F.2d 585, (9th Cir.1983)............................................................. 59

*Youst v. Longo*
     43 Cal.3d 64 (1987) .......................................................................... 87

VERIFIED COMPLAINT of Tensor Law P.C. vs. Michael Rubin, Harvey WEINSTEIN, et al

**STATUTES**

Cal Civil Code §1708.5 ................................................................................................ 18
California Business and Professional Code §6126 ........................................................ 89
California Evidence Code §1014 ................................................................................... 68
California Evidence Code §912 .................................................................................... 68
New York Consolidated Laws, Civil Practice Law & Rules (CPLR) §321(2) ............... 66
New York Consolidated Laws, Civil Practice Law & Rules (CPLR) §321(a) ............... 66
New York Consolidated Laws, Civil Practice Law & Rules (CPLR) §4507 ................. 68
NY Uniform Rules of Courts 22 NYCRR Part 200 §200.16 to §200.27 ..................... 38

**OTHER AUTHORITIES**

*American Bar Association – Ethics Tips – Second Opinions –* May 2017 ..................... 48

*Book of Approved Jury Instructions – BAJI -* No. 7.89 ................................................ 87

*California Rules of Professional Conduct* ..................................................................... 48

*Civil Conspiracy and Interference with Contractual Relations* (1975) 8 Loyola L.A. L. Rev. 302
    80

*Evidentiary Privileges: Grand Jury, Criminal, and Civil Trials" by Lawrence N. Gray, Esq.;* 6th
    Edition New York State Bar Association (2015) ................................................... 73, 75

*Interference with Contractual Relations: A Property Limitation* (1966) 18 Stan. L. Rev. 1406 . 80

*New York Rules of Professional Conduct* ..................................................................... 48

*Prosser & Keeton on Torts* (5th ed.1988) ................................................................. 80, 85

*Restatement 2nd of Torts* ......................................................................................... 63, 80

*Schwarzer, Tashima & Wagstaffe, Rutter Group Prac. Guide: Federal Civ. Pro. Before Trial,*
    (The Rutter Group - June 2016 Update) Ch. 11(I)-C .............................................. 60

**MEDIA REPORTS**

*Adam Ciralsky, "Harvey's Concern Was Who Did Him In": Inside Harvey Weinstein's Frantic
    Final Days,*
        Vanity Fair, January 17, 2018 ............................................................................ 59

*Ronan Farrow, Harvey Weinstein's Army of Spies,*
        The New Yorker, November 7, 2017 .................................................................... 75

*Ronan Farrow, Harvey Weinstein's Secret Settlements,*
        The New Yorker, November 21, 2017 .................................................................. 52

-9-

VERIFIED COMPLAINT of Tensor Law P.C. vs. Michael Rubin, Harvey WEINSTEIN, et al

1

2          COMES NOW Plaintiff, TENSOR LAW P.C. and complains of Defendants MICHAEL

3    F. RUBIN, an individual; HARVEY WEINSTEIN, an individual; and THE WEINSTEIN

4    COMPANY a New York Corporation with offices in Los Angeles, California, as well as DOES

5    1-50, inclusive as follows:

6

7                                    **I. INTRODUCTION**

8

9          1.      This is a matter wherein MICHAEL F. RUBIN (hereinafter "RUBIN"), a New

10   York attorney, acted to interfere with Plaintiff TENSOR LAW P.C.'s (hereinafter "TLPC")

11   contractual business interests in the representation of its client Paz De La Huerta, and to hinder

12   TLPC's efforts to advance criminal and civil prosecution of WEINSTEIN for sexual assault

13   against De La Huerta. The only beneficiaries of these alleged acts by RUBIN are HARVEY

14   WEINSTEIN (hereinafter "WEINSTEIN"), who has been a leading figure in the Film Industry,

15   and his Corporation, THE WEINSTEIN COMPANY (hereinafter "TWC").

16         2.      While every Defendant is entitled to the best defense through the legal system,

17   WEINSTEIN and TWC instead benefitted from actions of a criminal defense attorney – Michael

18   F. Rubin – who falsely and under secrecy, represented himself to TLPC's client De La Huerta as

19   a victim's rights advocate. On information and belief, RUBIN actually acted for the benefit of

20   WEINSTEIN and TWC – to interfere by a series of harmful subterfuges, threats, and extortion

21   demands, entirely outside the legitimate strictures of the legal system. In this plan, RUBIN acted

22   secretly to a) *mislead De La Huerta* into believing RUBIN was supporting her case, while in fact

23   he was working to b) ruinously *expose her medical records* to the public, c) *convince her to*

24   *proceed without any representation*, and to d) *withdraw her complaint against WEINSTEIN*. As a

25   result of these acts – and despite TLPC's success at protecting De La Huerta herself - Tensor Law

26   P.C., whose representation De La Huerta terminated, suffered harms for which it now seeks

27   redress.

28         3.      Because of the very large number of litigations commencing and pending against

                                          -10-

WEINSTEIN and TWC, these entities commenced a series of pre-emptive and disruptive tactics including: a) the use of Mossad agents (former Israeli Intelligence) to *investigate and intimidate victims*, and b) use of tactics of persons they hired *working under false pretenses to befriend* and co-opt expected plaintiffs (such as Rose McGowan) who had been assaulted by WEINSTEIN, in order to c) block, interfere with and gain an undeserved and unfair advantage over as part of d) a vast multi-million dollar effort to prevent or minimize the success of those who had been assaulted in their efforts to seek redress. This effort to interfere with and disrupt the normal operations of the legal system included retaining some of the most prominent and respected attorneys in the country including David Boies (who represented the New York Times even as Boies hired sub-rosa agents to undermine and intimidate New York Times reporters) and Lisa Bloom daughter of Gloria Allred – even as Allred moved to represent many of the victims of her daughter's client. Thus, at the current moment, after the expenditure of several million dollars to undermine and preempt legal efforts against him, more than 80 women have complained of sexual assaults by WEINSTEIN – including numerous rapes -, but no criminal prosecutions have commenced and very little has moved forward on a civil basis.

4.     Michael Rubin is a specialist in the criminal defense of rapists. The website for his law firm Kelly & Rubin LLP has a section for personal injury that lists nine categories of personal injury but for which seven have categories have no link or actual webpage (see Exhibit A). In addition, he has a page for criminal defense wherein all six categories have active links and associated webpages including a page for sexual assault. Uniquely, he additionally has a separate web page offering to defend those who rape children with Visa, Mastercard and American Express logos at the top, see figure 1 below, or if not taken down:

http://www.kellyrubin.com/Criminal-Law/Sexual-Assault/Child-Sex-Crimes.shtml

In particular RUBIN features a general remedy of filing false arrest actions against the New York Police Department and malicious prosecution against the New York District Attorney.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Figure 1 – Child Sex Crimes Page of website of Kelly & Rubin, LLP

5.     RUBIN is a well known public figure because he is formerly an assistant district

attorney in the Bronx and he is a famous public figure because of his work in the *defense of a heinous serial rapist*, Fletcher A. Worrell, wherein Rubin and his efforts to derail the prosecution were extensively covered in a series of New York Times articles. He battled against the extension of the statute of limitations for rape. The exact extension that forms the basis for De La Huerta's case against WEINSTEIN:

The New York Times

N.Y. / REGION

# In New York, Power of DNA Spurs Call to Abolish Statute of Limitations for Rape

By JULIA PRESTON   JAN. 2, 2006

It was his eyes. She was flipping through a newspaper, and suddenly his eyes were staring at her from a police photograph in the crime pages. Even before she read the headline, she felt shock. Then nausea.

"The way he came at me with that knife, I can't forget those eyes," she said, recalling the stranger who climbed through her Manhattan apartment window one night in late 1972 and raped her.

The man's photograph, published last April, brought it all back in an instant for Stefanie Aubry, the victim. It brought back her agonizing decision to submit silently so he would not harm her two young daughters, asleep in the same room. It revived her furious anger -- even though the crime happened more than three decades ago.

Ms. Aubry learned from news accounts that the man's name was Fletcher A. Worrell and that he was accused, based on DNA evidence, of a strikingly similar rape in the same area of Manhattan just seven months after her attack. Certain that he was the one who had assaulted her, Ms. Aubry called the Manhattan district attorney.

───────────

Mr. Worrell's lawyer, Michael F. Rubin, declined to comment on the cases of the six victims who came forward after his client's picture was published, saying Mr. Worrell had not been legally implicated in any of them. But he disputed the idea that DNA testing had made the statute of limitations outdated.

The statute "ensures timely prosecution when memories are still fresh, and the advent of DNA technology hasn't changed that," Mr. Rubin said.

Figure 2 – New York Times Report of January 2, 2006 about the impact of DNA technology on the statute of limitations for rape

6.      As detailed below, RUBIN pursues an aggressive policy to obtain clients which will include secret and surreptitious aggressive contacts with already-represented clients and cold calls to arrange referrals to potential clients identified through the news feed that comes through his web site and other sources. RUBIN holds himself out to be the most experienced, knowledgeable and successful defender of rapists in New York, with numerous personal contacts inside the New York County District Attorney's office.

7.      When RUBIN learned that WEINSTEIN was under criminal investigation for rape in New York, he can be reasonably expected to have contacted individuals who were in a position to communicate with WEINSTEIN's defense team and the TWC defense team to offer his superior expert defense attorney services. These services for which he professes to be among the leading experts are for a) the derailment of any grand jury indictment for rape and – if unsuccessful in preventing indictment – b) for the best possible defense representation in New York.

8.      Certainly, for a defense attorney who represents himself as a leading specialist in defending New York rapists, an opportunity to associate himself publicly with WEINSTEIN – aside from the remunerative possibilities - would greatly enhance his standing in the segment of the public most important to his business and to whom his marketing is directed. However, shortly thereafter, he contacted Paz De La Huerta to falsely and fraudulently offer his expertise to "help assure success" in her criminal charges against WEINSTEIN.

9.      RUBIN first instructed De La Huerta to keep all communications between himself and her absolutely secret from everyone and most importantly not to inform her attorney – FILLER– of any of his contacts with her, nor of the actions he would instruct her to carry out. During this time, *he provided false information* – such as informing De La Huerta that she must urgently and immediately terminate representation by TLPC because TLPC could not act on her behalf in New York – e.g. tainting her case by practicing law without a license in New York. This was obviously untrue because TLPC partner Alex R. Straus, Esq. is an experienced New York licensed attorney (NY Bar #5175419). This was defamatory and false although he informed De La Huerta that he had carefully researched this fact and that it mandated her to terminate counsel

immediately and become unrepresented rather than risk false representation by TLPC.

10.     If RUBIN's research extended as far as looking at the TLPC website, then this was a provably knowing falsehood. If he made this assertion without even looking at the website, then it was reckless and wanton and so goes beyond being negligent and unknowing. This was a false and defamatory allegation of gross misconduct against TLPC, made to undermine the confidence of De La Huerta and to cause her to panic into terminating TLPC. RUBIN knew he was lying at the time he put this in writing in a communication to De La Huerta. His purpose was to undermine TLPC's attorney-client relationship and to stampede De La Huerta into a frantic act that would harm her and harm her efforts to seek justice from WEINSTEIN. It would disrupt a proceeding – the motion before Judge Charles Solomon - which was part of the Grand Jury proceeding. In this fashion, RUBIN used a falsehood to attempt to disrupt the Grand Jury process.

11.     After this series of efforts to damage and humiliate De La Huerta, RUBIN informed her, on November 12, she had no case and should withdraw her allegations against WEINSTEIN. On information and belief, he then went on to advise the New York District Attorney not to indict WEINSTEIN. During the course of these actions, De La Huerta's attorney Filler, at TENSOR LAW PC did discover RUBIN'S activities and commenced an investigation of RUBIN. De La Huerta also did not follow RUBIN's advice to withdraw her complaint, but did terminate TLPC's representation in this matter – although continuing to retain TLPC as to other prior matters. Without first seeking to review any case files of De La Huerta's attorney FILLER, RUBIN made calls to the Manhattan District Attorney assigned to the De La Huerta matter, Maxine Rosenthal, with false and discouraging advice, leading to the abrupt halt of progress toward indictment of WEINSTEIN. De La Huerta then retained Carrie Goldberg, Esq. – a specialist in the protection of the privacy of sexual assault victims. Although RUBIN knew Goldberg had been retained on November 8, he continued his secret efforts including travelling to Spain to meet with De La Huerta and interview her extensively on November 12. This allowed him to obtain extensive confidential information from De La Huerta, and during this period, convincing De La Huerta to keep his actions secret from her new specialist attorney Goldberg, as well, at least through November 12, 2017 when Filler learned of RUBIN's actions and

1    subsequently informed Goldberg.

2        12.    Because more than 80 individuals around the country have reported being victims

3    of WEINSTEIN and because thousands have experienced work related, or power imbalance

4    sexual assault that have been brought to light because of the events related to WEINSTEIN, there

5    has been intense media interest. Media in the WEINSTEIN matter has a capability to disarm or at

6    least provide some balance to pressure from the multi-million dollar high power WEINSTEIN

7    defense machine. Further media coverage is a means by which witnesses may become aware of

8    assaults and thereby come forward to help corroborate what has taken place. It is additionally a

9    means by which victims can be made aware of the subterfuges and counter-efforts arrayed against

10   their efforts to seek justice. RUBIN additionally convinced De La Huerta that she must have no

11   media coverage and must not put any pressure on the NY DA's office to proceed with her case.

12       13.    Importantly, this case also turns on the nearly successful efforts of RUBIN to

13   cause a waiver of De La Huerta's patient-psychotherapist privilege and to gain personal

14   possession of these records, thus releasing hundreds of pages of intensely personal details to the

15   public. This sort of action – as RUBIN and WEINSTEIN both are likely aware – is exactly the

16   reason why many women will not seek criminal prosecution of a rapist. This included an effort by

17   RUBIN, to the benefit of WEINSTEIN, to falsely represent himself as her attorney to attempt to

18   gain control of the records, to attempt to cause De La Huerta to be unrepresented at a critical

19   juncture, and to attempt to interfere with a proceeding in relation to a New York Grand Jury.

20                                      **II. PARTIES**

21       14.    Plaintiff Tensor Law P. C. (hereinafter "TLPC") is a California licensed Law

22   Corporation with whose Managing Partner is Aaron G. Filler, Esq. and who is also a licensed

23   physician in both California and New York who maintains a neurosurgical practice and a law

24   practice. FILLER's law firm – Tensor Law P.C. - includes partner Alex Strauss, Esq. who is a

25   New York Licensed attorney and Chanel Katiraie, Esq, a California attorney. FILLER was

26   retained by a California resident and prominent actress – Paz De La Huerta – to represent her in a

27   matter in which Lionsgate is the defendant. This matter is currently pending as a petition for

28   review before the Supreme Court of California (S245626). Under the agreement between FILLER

                                            -16-

and De La Huerta, he represents her on various other matters under the condition that he agrees to the representation. On this basis, De La Huerta contacted TLPC on October 14, 2017 asking for representation in regard to allegations including two rapes by Harvey WEINSTEIN occurring in New York and a sexual exposure episode occurring in Los Angeles and TLPC agreed to provide representation. As is thoroughly demonstrated by public actions, under the intense pressure that ensued – De La Huerta and TLPC acted in the context that any interruption of representation by TLPC in regard to WEINSTEIN would be abandonment and TLPC agreed to continue to provide full representation for her including the services of the firm through its New York licensed partner Alex Straus. Filler also maintains a background physician –patient relationship with De La Huerta in California, and New York and through his UK GMC licensure – throughout European Union and Commonwealth countries.

15.     Defendant, Michael F. Rubin, Esq. is a New York & New Jersey Licensed attorney whose practice, Kelly & Rubin LLP, is located at 40 Wall Street, 25th Floor, New, NY 10005. RUBIN is a former criminal prosecutor who worked as an assistant District Attorney in the office of the Bronx County District Attorney (1986-1991). He is the subject of a number of news reports because of his representation of a serial rapist, Fletcher Worrell, who was among a number of rapists and child rapists he has represented. He further established himself as a public figure by speaking out in the New York Times to oppose extension of the statute of limitations for rape. He does not represent De La Huerta but attempted to obtain a physical copy of two years of De La Huerta's detailed psychotherapist records from therapist SueAnne Piliero, PhD, which action - if he had succeeded - would have waived De La Huerta's patient psychotherapist privilege to prevent public access to these very private records. RUBIN is sued herein as an individual or as an agent of an Undisclosed Principal if proof of agency can be established, see *Klinger v. Modesto Fruit Co*. 107 Cal.App 97, 100 (1930); *Luce v. Sutton* 115 Cal.App.2d 428, fn 4 (1953), *Schnier v. Percival* 83 Cal.App 470, 479 (1927) and *Patterson v. Dominos Pizza LLC* 60 Cal.4th 474, 492 (2014).

16.     Defendant Harvey WEINSTEIN is an accused serial rapist who alleges that all of the reported sexual assaults were in fact consensual and he is named as a potential undisclosed

principal of Defendant RUBIN in this action at this time. FILLER's client Paz De La Huerta has alleged rape and sexual exposure by WEINSTEIN. WEINSTEIN has been the CEO of MiraMax films and THE WEINSTEIN COMPANY which entities engage in production of major motion pictures. In that role, he has produced a remarkably large number of very successful films which have garnered numerous Oscars and Golden Globe awards. He has a long well documented history of hiring former New York Assistant District Attorneys to investigate and undermine accusers and to intervene both publicly and non-publicly on his behalf. Notably and specifically this includes former Bronx Assistant District Attorney Daniel Karson. Former ADA Karson was actively and directly employed by WEINSTEIN to investigate and undermine Ambra Battilana Gutierrez in 2015 while the New York District Attorney Cyrus Vance was considering whether or not to pursue an indictment by empanelling a Grand Jury – they ultimately did not indict. WEINSTEIN is a potential undisclosed principal in this litigation because on information and belief he arranged through intermediaries to employ and direct the actions of Michael F. Rubin  - another former Bronx Assistant District Attorney – in a series of bizarre and inappropriate efforts to compromise and undermine TLPC's client De La Huerta in 2017 while the New York District Attorney was considering whether or not to pursue an indictment by empanelling a Grand Jury.

17.     Defendant The Harvey WEINSTEIN Company, LLC (hereinafter "TWC") is named as a potential undisclosed principal of Defendant RUBIN in this action at this time. It has offices at 9100 Wilshire Blvd, Beverly Hills, California and also at 375 Greenwich Avenue, New York, NY. It is registered with the Secretary of State, in the State of California under registration number: #200513810010, having extensive regular business and extensive contacts in the State of California and is therefore subject to general jurisdiction in the State of California. Actions of TWC and/or its officers, as well as it's Manager Frank Gil's destruction of relevant records, constitute a substantial part of the subject matter of this dispute and it is properly a potential undisclosed principal in this case.

18.     Defendant "Black Cube" which is formally B.C. Strategy UK LTD had a contract with Boies Schiller & Flexner (see Exh. F & H) as an agent for WEINSTEIN with Black Cube as the sub-agent that was executed in 2017 and which was in effect and included an undertaking to

prepare a report – for WEINSTEIN – by November 10, 2017 (three days after RUBIN's attempted interception of De La Huerta's records). The contract provided for a basic payment of $200,000 to Black Cube but for an additional $300,000 to be paid if it obtained critical actionable information, wherein Black Cube would not get the $300,000 and would punitively have to work for an extra month without pay if it failed to meet its objective by the deadline of November 10, 2017. The company – which employs various former Mossad intelligence agents - has publicly acknowledged that its efforts were directed at protecting WEINSTEIN from accusations of sexual assault. The company has acknowledged sending its agent Stella Penn Pechanac, a resident of Jaffa, Israel, into New York and into California – including to the Venice, California boardwalk during 2017 – for the purpose of gathering information to protect WEINSTEIN from being called to account for his alleged sexual assaults. This company's contract would likely have been the source of funds payable to RUBIN if the paper copy of the records could have been obtained and delivered to WEINSTEIN by November 10, 2017 and this deadline appears to explain RUBIN's urgent efforts on November 7, 2017 to get a paper copy of the records by November 8, rather than waiting to receive them from De La Huerta as a PDF at the time of his scheduled November 12 meeting with her in Spain as he originally planned. The principal company is headquartered in Tel Aviv, Israel, and the affiliated UK entity holding the contract has offices in London at City Point, 1 Ropemaker St., Moorgate, London, England, UK, EC2Y 9HT. The principal Israeli office is at 3 Mazeh Street, Tel Aviv, Israel. The contracted London entity, B.C. Strategy UK LTD, is properly named as a possible undisclosed principal in this case. Black Cube similarly was used by WEINSTEIN to investigate and intimidate board members of a charity AmFAR (American Foundation for AIDS Research) and therefore additionally form part of a modus operandi and pattern of bad acts by WEINSTEIN.

19.     Defendant K2 Intelligence, LLC is an investigative firm founded in 2009 by Jeremy M. Kroll and Jules B. Kroll (Jeremy's father) which typically does corporate investigation, but which WEINSTEIN employed to investigate the model Ambra Battilana Gutierrez for the purpose of convincing the New York District Attorney that an indictment of WEINSTEIN for his alleged Gutierrez assault should be abandoned based on their investigations

-19-

of her past behavior and actions. The firm employs numerous former Manhattan Assistant District Attorneys (Robert Brenner, Jordan Arnold, Paul E. Ryan, Charles Lineham) as well as numerous former NY Police Department detectives. Jules B. Kroll – the founder – is a former New York Assistant District Attorney. He also founded Kroll Associates – later Kroll Inc, sold to Marsh & Maclennan in 2004 – which employs Daniel Karson as a Director of Investigations. Like RUBIN, Karson is also a former Bronx Assistant District Attorney – who directly handled the distribution of undermining information about Ambra Battilana Gutierrez to media in 2015. Karson has worked to show that Cyrus Vance – New York County District Attorney – is not compromised by the campaign funds that Vance received from WEINSTEIN.

20.     During the period when the NY DA was considering an indictment of WEINSTEIN in the Gutierrez matter, K2 Intelligence staff had direct communication access to NYPD detectives and district attorneys in the NY DA sex crimes unit to whom they provided their findings. They also worked with media to place stories tending to bring Gutierrez's credibility into question. This company is believed to have been involved as an intermediary between WEINSTEIN or some other undisclosed principal and RUBIN so that they would be undisclosed agents and RUBIN would be their sub-agent. K2 Intelligence has offices at 845 Third Avenue, in New York City, and it is properly a potential undisclosed principal in this case.

21.     Defendant Linda Fairstein is a New York attorney, author, and former Chief of the New York County District Attorney's Office - Sex Crimes Unit who retired from that post in 2001. Out of an interest in developing films, she subsequently became an associate of WEINSTEIN. In 2015, Fairstein –acting on WEINSTEIN's behalf in relation to an effort to disrupt a prosecution of WEINSTEIN for sexual assault - arranged for a meeting between WEINSTEIN's then defense attorney Elkan Abramowitz and the current Chief of the Manhattan DA Sex Crimes Unit, Martha Bashford. That meeting was a critical event leading the New York County District Attorney – Cyrus Vance – to decide not to indict WEINSTEIN in the Ambra Battilana Gutierrez case. FAIRSTEIN at least knows of RUBIN because she has written about RUBIN's case – the Fletcher Worrell serial rapist prosecution. In consideration of her recent role in working to help WEINSTEIN hinder the 2015 Gutierrez matter and her acquaintance with

1    RUBIN, she is therefore properly a potential undisclosed principal in this case as a likely

2    intermediary between WEINSTEIN and RUBIN.

3        22.    Plaintiff is unaware of the true names or capacities, whether they are individuals or

4    business entities, of Defendant DOES 1 through 50, and therefore sues them by such fictitious

5    names and will seek leave of this Court to insert true names and capacities once they have been

6    ascertained. Among the named possible undisclosed principal defendants – whether principal,

7    agent, or subagent, direct contact or intermediary – the motivation was to halt criminal indictment

8    of Harvey Weinstein.

9        23.    Plaintiff will ask leave of court to amend this Complaint to show such true names

10   and capacities of such Defendants when the names of such Defendants have been ascertained.

11   Plaintiff is informed and believes and thereupon alleges that each of the Defendants designated

12   herein, including DOES, were authorized and empowered by each other to act, and did so act, as

13   agents of each other, and all of the things herein alleged to have been done by them were done in

14   the capacity of such agency and whether or not agency is established, they are responsible in

15   some manner and liable herein by actionable conduct, and that such conduct, was a substantial

16   factor in causing the injuries to Plaintiff complained of and as hereinafter alleged.

17                    **III. JURISDICTION, VENUE & CONFLICT OF LAW ANALYSIS**

18

19   *1) Events Underlying the Litigation Took Place in California*

20       24.    One of the events giving rise to this complaint took place in Los Angeles,

21   California in this Central District at the Four Seasons Hotel at 300 South Doheny Drive, Beverly

22   Hills, California  where WEINSTEIN exposed himself sexually to FILLER's client De La Huerta.

23   Four Seasons is a Toronto based Canadian entity but it is only the hotel manager. The owner of

24   the hotel is Burton Way Hotels LLC, of 2020 Century Park East, Ste. 2200, Los Angeles, CA. In

25   relation to this event, Chanel Katiraie, Esq, an attorney at Tensor Law PC, had prepared a civil

26   litigation for filing, alleging Assault, Sexual Battery in Violation of Cal Civil Code §1708.5, as to

27   WEINSTEIN, as well as Negligent Supervision as to THE WEINSTEIN COMPANY.

28

25.     Additionally, working at its California offices in Santa Monica, California, Tensor Law PC had prepared civil litigation for filing in New York alleging similar causes of action. Because the assaults took place in 2010, the California complaint alleged equitable estoppel as to the statute of limitations, while the New York litigation depended upon success of a criminal action in order to proceed.

### *2) Specific Personal Jurisdiction Over Defendant Michael F. Rubin is Shown to Be Valid*

26.     On November 7, Michael F. RUBIN purposely availed himself of the venue of California, by calling into California to speak to FILLER in his Santa Monica, California office while a motion was pending. He advised FILLER that he was terminated as counsel, that RUBIN was taking over immediately and he directed FILLER to halt filing of the California litigation and to withdraw any motions filed in New York. Through this purposeful availment and ordering the actions of a California attorney with regard to a California cause of action, the Superior Court of California has personal specific jurisdiction over RUBIN (see Exhibit C – Declaration of Filler).

27.     Establishment of Specific Personal Jurisdiction over an individual such as RUBIN in this matter is based on the principles set forth in *Bancroft and Masters v. Augusta National Inc.*, 223 F.3d 1082, 1087 (9th Cir., 2000) as well as in *Pavlovich v. Superior Court*, 29 Cal.4th 262, 272 (2002) and *Calder v. Jones* 465 U.S. 783, 789-791 (1984). As a preliminary matter, there is a requirement for purposeful availment:

> This "specific" jurisdiction exists if (1) the defendant has performed some act or consummated some transaction within the forum or otherwise purposefully availed himself of the privileges of conducting activities in the forum, (2) the claim arises out of or results from the defendant's forum-related activities, and (3) the exercise of jurisdiction is reasonable. See *Cybersell, Inc. v. Cybersell, Inc.,* 130 F.3d 414, 416 (9th Cir.1997).

*Bancroft* at 1086. In that case, a letter was sent to Virginia, which affected the plaintiff in California. The finding of jurisdiction was based on the "effects test" established by the U.S. Supreme Court in *Calder v. Jones* at, e.g. 789:

> In Calder,  the Supreme Court held that a foreign act that is both *aimed at* and *has effect in* the

-22-

forum state satisfies the purposeful availment prong of the specific jurisdiction analysis. To meet the effects test, the defendant must have (1) committed an intentional act, which was (2) expressly aimed at the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state. See *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir.1998).

*Bancroft* at 1087 (emphasis added).

28.     Herein, Plaintiff alleges that Rubin 1) committed an intentional act by calling into California to falsely "terminate" Filler as counsel for De La Huerta and order the withdrawal of a court filing; 2) expressly aimed at the forum state by calling a California attorney, at a California law firm, and ordering that attorney to take certain actions in California; 3) causing harm, the brunt of which was suffered in California where Filler and TLPC were faced with a burdensome crisis as they sought to perform their duty to protect their client De La Huerta.

29.     The critical additional test set forth by the Ninth Circuit in Bancroft is termed "*express aiming*," see *Bancroft* at 1087. The Bancroft court established that:

[T]he requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct *targeted at a plaintiff* whom the defendant knows to be a resident of the forum state.

*Bancroft* at 1087 (emphasis added). Plaintiff alleges complete proof that RUBIN targeted FILLER & TLPC with full knowledge that the Plaintiff was in California:

The critical factor was that in sending the letter, the defendant "was purposefully defrauding [plaintiff] in California." [*Metropolitan Life Insurance Co. v. Neaves*,] 912 F.2d [1062,] 1065 (9th Cir. 1990).

*Bancroft* at 1087. The California Supreme Court has clearly endorsed this analysis based on the Ninth Circuit Court of Appeals interpretation of U.S. Supreme Court jurisprudence on this issue and confirmed that it applies generally for intentional torts directed into California:

As the majority indicate, the *Calder* test of minimum contacts based upon conduct expressly aimed at the forum is not limited to defamation actions. It applies to intentional torts generally. (See, e.g., *Bancroft & Masters, Inc. v. Augusta Nat. Inc*. (9th Cir.2000)

Pavlovich at 287. Specifically relevant in Pavlovich is the application of this analysis to intentional business torts:

Although Calder involved a libel claim, courts have applied the effects test to other intentional torts, including business torts. (*See IMO Industries, Inc. v. Kiekert AG* (3d

-23-

Cir.1998) 155 F.3d 254, 259–260, 261)

*Pavlovich* at 270.

30.     For all of these reasons, it is clear that a United States District Court in the Central District of California will have Specific Personal Jurisdiction over RUBIN.

*3) Location and Headquarters of the Parties are Such That Complete Diversity is Established and Diversity Subject Matter Jurisdiction Is Demonstrated*

31.     THE WEINSTEIN COMPANY, LLC (hereinafter "TWC") has offices at 9100 Wilshire Blvd, Beverly Hills, California and also at 375 Greenwich Avenue, New York, NY. It is registered with the Secretary of State, in the State of California under registration number: #200513810010, having extensive regular business and extensive contacts in the State of California and is therefore subject to general jurisdiction in the State of California but considered as a resident of New York for purposes of establishing diversity jurisdiction, see *Hertz Corp v. Friend*, 559 US 77, 78 (2010).

32.     WEINSTEIN, upon information and belief, is now, and at all times mentioned herein was, an individual, over the age of majority, residing in the City of Los Angeles, County of Los Angeles, State of California and in the City of New York, County of New York, State of New York who has engaged in the buying and selling of property at least at 518 North Kilkea Avenue in Beverly Hills, California and who has extensive regular business activities and extensive contacts in the State of California, thereby subjecting him to general jurisdiction in the State of California.

33.     K2 Intelligence, LLC has an office in Los Angeles California at 777 S. Figueroa St., Los Angeles, CA 90017 and has headquarters in New York at 845 Third Avenue, NY, NY 10022. A principal of the California office is Jordan Arnold who is a former New York Assistant District Attorney. K2 Intelligence will be subject to general jurisdiction in California because it has an operating, staffed business unit in California but considered as a resident of New York for purposes of establishing diversity jurisdiction, *see Hertz, supra*.

34.     BC Strategy UK LTD (Black Cube) dispatched its employee Stella Penn to work

as a secret agent to hold conversations with Rose McGowan and to investigate her including meeting in Venice, California. Because of this purposeful availment of California by Black Cube in the specific type of work of interest in the current matter, it will be subject to specific jurisdiction in California.

35.    K2 Intelligence and The Weinstein Company have California offices located in the in the Western Division of Central District of California, Harvey Weinstein owns a home in the Western Division of Central District of California. Because three Defendants and the Plaintiff are associated with the Western Division of Central District of California, venue is appropriate in the Western Division of Central District of California United States District Court.

36.    WEINSTEIN is currently believed to be in Scottsdale, Arizona, where he has been seen repeatedly at an apartment complex at 6895 E. Camelback Rd. The likelihood of Defendant WEINSTEIN's arrest if he appears in New York to respond to this suit also makes venue in California more likely to assure progress of this action as opposed to a venue in New York.

37.    For all of these reasons, the Western Division of Central District of California will have jurisdiction as to all defendants and venue is appropriate in the Western Division of Central District of California. Venue is appropriate in California because key elements of RUBIN's efforts involved calls by RUBIN into California to affect De La Huerta's counsel in California. The CONTRACT interfered with is a California contract made and signed in California between California Residents. Further, RUBIN interfered with a not-yet-filed lawsuit drawn up by TLPC attorneys Chanel Katiraie and Aaron Filler which addressed WEINSTEIN's harassment of De La Huerta in California and negligent supervision by TWC.

38.    There is complete diversity such that Diversity Subject Matter Jurisdiction is established because Plaintiff Tensor Law PC is headquartered in California, but Defendant WEINSTEIN is a resident of New York, Defendant THE WEINSTEIN COMPANY is headquartered in New York, Defendant K2 Intelligence is headquartered in New York, Defendant Linda Fairstein is a resident of New York, Defendant BC Strategy UK LTD is headquartered in London, UK and Defendant BC Strategy LTD (Israel) is headquartered in Tel Aviv, Israel.

VERIFIED COMPLAINT of Tensor Law P.C. vs. Michael Rubin, Harvey WEINSTEIN, et al

*4) Choice of Law Is Appropriately California Law as to the Contract Issues Based on Lex Loci Contractus and Lex Loci Solutionis Principles*

39.     The Choice of Law in a Contract case is determined by the principal of *Lex Loci Contractus* to the extent that the action concerns the terms and elements of the contract. The contract at issue was formed in California in that the two parties Aaron G. Filler, Esq. of Tensor Law P.C. met personally with Paz De La Huerta in the Santa Monica, California offices of Tensor Law P.C. and the contract was then executed by both parties. At the time of contracting, Filler was a resident of California and TLPC was a California Corporation (C3789611). Filler was licensed to practice law in the State of California under State Bar of California License #302956. Tensor Law P.C. holds a Certificate of Registration with the State Bar of California, Certificate #21835. Attached as exhibit J is a declaration and as Exhibit K the notarized affidavit of Paz De La Huerta of June 5, 2015 asserting Domicile in California. The contract was signed on May 29, 2015 (see contract to be filed separately under seal) and a separate Declaration of Domicile executed by Paz De La Huerta on May 29, 2015 documenting her physical presence in California at the time of formation of the contract.

40.     Additionally the principal of *Lex Loci Solutionis* affects disputes relating to the performance of the contract and the performance – including the preparation of legal filings, writing of emails, and evaluation of legal precedent and strategy all took place in California. The last act of performance as to the Weinstein matter was the signing of an agreement for substitution by Carrie Goldberg, Esq. and the signing similarly was performed in California.

41.      Therefore, to the extent that the case turns on determinations such as whether this contract applied to the WEINSTEIN related matters, *Lex Loci Contractus* indicates California Law.  To the extent that the case relies on determining the burdens on performance then *Lex Loci Solutionis* indicated California Law.

*5) Choice of Law Is Appropriately California Law as to the Tort Issues Based on a Governmental Interest Analysis*

42.     The causes of action for Intentional Interference with Contractual Relations and

for Intentional Interference with Prospective Economic Advantage are Torts so that Choice of

Law is determined substantially by a governmental interest analysis:

> This governmental interest analysis involves three steps. (1) The court determines whether the foreign law differs from that of the forum. (2) If there is a difference, the court examines each jurisdiction's interest in the application of its own law to determine whether a "true conflict" exists. (*McGhee v. Arabian American Oil Company, supra*, 871 F.2d [1412] at p. 1422 ,[(9th Cir. 1989)],  citing *Offshore Rental Co. v. Continental Oil Co., supra*, 22 Cal.3d  [157]at pp. 161–162 (1978),148 Cal.Rptr. 867, 583 P.2d 721.)  When both jurisdictions have a legitimate interest in the application of its rule of decision, (3) the court analyzes the "'comparative impairment' of the interested jurisdictions." (*McGhee, supra*, 871 F.2d at p. 1422.  The court applies " ' "the law of the state whose interest would be the more impaired  if its law were not applied. " ' [Citations.]" (Ibid.,  italics added, quoting from *Offshore Rental Co., supra*, 22 Cal.3d at p. 165, 148 Cal.Rptr. 867, 583 P.2d 721.)

*Tucci v. Club Mediterranee, S.A.*, 89 Cal.App.4[th] 180,189 (2001). New York and California Law

differ substantively in several areas relevant to this case, so that a formal interest analysis is

necessary.

      43.     Firstly, it has been the holding of a series of California Supreme Court rulings

such as *Reeves v. Hanlon, 33 Cal.4[th] 1140 (2004)*, that Intentional Interference with Contractual

Relations (hereinafter "IICR") can be pled in the setting of an *at will* contract while in New York

it is clear that no such cause of action may be pled, see *NBT Bancorp, Inc v. Fleet/Norstar*

*Financial Group, Inc.,* 159 A.D.2d 902, 911 (1990). The stated grounds for the New York

position is that the elements of IICR in New York require breach of contract and resulting

damages, see *Rad Advertising Inc. v. United Footwear Organization, Inc.,* 154 A.D.2d 309, 310

(1989). Thus, in an at will contract there can only be a "mere expectation" of future benefits so

that no actual damage can be shown. California, by contrast, recognizes that mere interference

that makes the performance of a contract more difficult will be sufficient. Further, California has

established that the use of some means that violates a judicially evaluable standard for the

purpose of convincing an employee to switch to a new employer is actionable, see *Reeves, supra*,

at 1153. This is because California recognizes a value in a business constituted by its employees

much like any asset, while New York Courts have not fully considered this issue. California

Courts have expressed a strong interest in this issue while New York Courts are largely silent on

this or dismiss the issue without discussion.

44.     Plaintiff does argue that the contract at issue was not "at will" at the time it was interfered with because a motion was pending before a court. Thus, neither party had the power to terminate at will without approval of a court or the execution of a substitution/change of counsel agreement. Otherwise, the client would have carelessly gone from unrepresented to pro se just as a hearing was about to proceed in relation to a complex legal matter of extremely high importance to the client and to the courts. However, New York law requires an actual breach to establish the tort, but California has longstanding law that finds sufficient interference from acts that make a contract more burdensome to perform, see for California elements - *Pacific Gas & Electric Co. v. Bear Stearns & Co*., 50 Cal.3d 1118, 1129 (1990) versus for New York elements - *Joan Hansen and Co. Inc v. Everlast Worlds Boxing Headquarters,* 296 A.D.2d 103, 111 (2002). This is issue is similarly a subject for a series of California Supreme Court rulings such as  *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.*,  36 Cal. 3d 752, 766 (1984) and *Lipman v. Brisbane Elementary Sch. Dist*.,  55 Cal.2d 224, 232 (1961) – but is little attended to by New York courts.

45.     Further, California courts have tended to eliminate the requirement for wrongful conduct in establishing IICR where a third party induces one of the parties to breach an at will contract:

> We hold that *Reeves's* [*supra*] additional requirement of pleading and proof of an independently wrongful act in contract interference claims involving at-will employment contracts does not apply where, as here, the employee is the alleged victim of a third party's conduct in inducing its business partner to terminate his or her employment contract.

*Popescu v. Apple Inc*., 1 Cal.App.5[th] 39, 62 (2016).

46.     Here because a California law firm and California contract were interfered with, California has a strong interest in protecting the California rights of its citizen and resident corporation. New York, by contrast would be asked to express its interest in protecting a New York attorney engaged in fraud and deceit with obvious purpose of harming a client. For these reasons, at very least based on the facts as pled, California Law should be chosen in a Conflict of Laws analysis for this tort in this case.

47.     Finally, California has an extensive series of cases that formulate the implied by conduct basis for establishing agency (see *Thayer v. Pacific Elec. Ry. Co*. 55 Cal.2d 430, 438 (1961); *Pollack v. Lytle* 120 Cal.App.3d 931, 940 (1981); *Scholastic Book Clubs Inc. v. State Bd. Of Equalization* 207 Cal.App.3d 734, 738 (1989); *Michelson v. Hamada* 29 Cal.App.4[th] 1566,1579 (1994); *Bergtholdt v. Porter Bros Co*. 114 Cal. 681, 685 (1896)) wherein this is virtually absent in New York law. Additionally California has been concerned with the power of an undisclosed principal wherein a subterfuge is the basis for effecting coordinated action against individual California citizens, see *Klinger v. Modesto Fruit Co*. 107 Cal.App 97, 100 (1930) where individual farmers were manipulated by apparently independent local fruit buyers, when in fact the various buyers were acting on behalf of a large fruit processing corporation which was undisclosed to the farmers for purposes of taking advantage of them. California has a strong interest in applying the principles of implied contract when establishing undisclosed agency, see *Del E. Webb Corporation v. Structural Materials Co*., 123 Cal.App.3d 593, 611 (1981) while New York courts have simply attended little to this area of public concern.

48.     For all of these reasons, a governmental interest analysis for conflict of laws reveals that a far greater interest is validated for application of California Law in the situation of this case.

## IV. FACTUAL ALLEGATIONS

## A. Events Leading To Client De La Huerta's Causes of Action Against WEINSTEIN and THE WEINSTEIN COMPANY

49.     Plaintiff's client, Paz De La Huerta has publicly alleged that her strictly professional relationship began with WEINSTEIN when she was 14 years old in 1999. WEINSTEIN was working for the Company Miramax. Miramax produced the film "Cider House Rules" in which De La Huerta was employed as an actress. Subsequently, the client's residence was in the same Tribeca neighborhood of Manhattan, New York, in which both TWC's offices were located and where WEINSTEIN was residing. TLPC's position continues to be that De La

Huerta has made public statements, which together with evidence located by her and by TLPC make a compelling case for indictment of WEINSTEIN on criminal charges. A determination on this issue is still pending before the New York County District Attorney. The dates and locations recited below are based on public information available to Plaintiff on or before November 9, 2017 and may not reflect further information subsequently developed by the New York Police Department, the New York District Attorney's Office, De La Huerta's current counsel Carrie Goldberg, Esq., or by De La Huerta.

*1) Initial Assault on December 7, 2010*

50.     On December 7, 2010 Plaintiff's client De La Huerta encountered WEINSTEIN at a lounge called "Top of the Standard" (aka Boom Boom Room) on the High Line located in Manhattan, New York, because both were attending a party at that location celebrating the opening of a movie called Blue Valentine. De La Huerta and WEINSTEIN were neighbors who did recognize each other occasionally – as at grocery stores or cafes as well as having a prior employee/employer relationship from 1999.

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15

Figure 3 – Photos of WEINSTEIN and De La Huerta at Blue Valentine afterparty 12-7-2010

16        51.     According to De La Huerta's public statements, WEINSTEIN offered De La

17  Huerta a ride home to Tribeca which De La Huerta agreed to. On the way to De La Huerta's

18  home, WEINSTEIN continuously pressured De La Huerta to have a drink with him. Upon

19  reaching De La Huerta's home, WEINSTEIN insisted on coming up to De La Huerta's apartment

20  to avoid discussing business and personal matters in the public lobby of De La Huerta's

21  apartment building. Once inside of De La Huerta's apartment, WEINSTEIN made warnings to De

22  La Huerta about harm to her career if she did not submit to sex, then forced himself on De La

23  Huerta and raped De La Huerta.

24        52.     In her public statements, Plaintiff's client Paz De La Huerta alleges that

25  WEINSTEIN or an employee of TWC then called De La Huerta's cellphone at least several times

26  over the following two weeks. WEINSTEIN would tell De La Huerta that he was waiting outside

27  of her apartment building in his vehicle or in the lobby of the building waiting for her. De La

28

1 Huerta would avoid his calls, and avoid returning to her home until she could confirm with the

2 doormen that he had left the premises. WEINSTEIN continued this behavior through the two

3 weeks after raping De La Huerta.

4 *2) Corroboration of First Assault*

5       53.     According to news reports, WEINSTEIN had a protective program for his assaults

6 which included seeking to have a photograph taken with his prior victim, following any assault.

7 When the October 5, 2017 report in the New York Times by Jodi Kantor caused a furore about

8 the assaults, WEINSTEIN produced a number of such photographs to the board of directors of

9 THE WEINSTEIN COMPANY for the purpose of showing that these photographs would derail

10 any criminal or civil action against him. WEINSTEIN procured such a photograph with De La

11 Huerta, one week after the first rape:



Figure 4 – Photo of WEINSTEIN with De La Huerta on 12-13-2010

      54.     TLPC located and presented the December 7th, 2010 photographs to the NYPD to

show the date of the first assault and to prove the veracity of De La Huerta's statements to the NYPD. TLPC located and presented the December 13th, 2010 photo to the NYPD to prove that WEINSTEIN had developed a direct interaction with WEINSTEIN. Further TLPC asserted that in the light of the revelation of WEINSTEIN's defensive modus operandi (obtaining public, post-assault photographs for defensive purposes), this provided prima facie evidence of an active cover-up by WEINSTEIN tending to prove an assault from which he believed he would need a defense. The December 13th photos are the only time these two persons have been photographed together.

*3) Second assault on December 23, 2010*

55.     Additionally, in her public statements, Plaintiff's client De La Huerta states that shortly thereafter, on December 23, 2010, De La Huerta received a phone call from WEINSTEIN while she was at work doing a professional photo-shoot wherein he again stated that he was waiting outside her building and insisted he would remain there until he she got home. The photographer is able to corroborate at least the date. De La Huerta has reported in her public statements that she decided to confront WEINSTEIN to point out that she viewed this as stalking and that he was to leave her alone, but out of stress and alarm, commenced drinking heavily on the way home to her apartment.

56.     She has stated that she did confront WEINSTEIN, again waiting at the lobby of her home when she returned home. De La Huerta told WEINSTEIN to leave, to which WEINSTEIN "hushed" her and insisted that they speak in a private place, promising that they would be able to resolve this discussion in her apartment. Upon reaching De La Huerta's apartment, WEINSTEIN again raped her using overpowering physical force. WEINSTEIN left immediately after he raped De La Huerta, leaving her in a state of absolute shock, humiliation, embarrassment, and pain.

57.     Following this confrontation and attack, however, WEINSTEIN did cease his series of direct contacts, personal calls, and calls by his office staff directed at arranging to meet De La Huerta at her New York apartment as well as ceasing all uninvited visits to her building.

Following media reports in November of 2017, additional witnesses came forward to corroborate WEINSTEIN's presence in De La Huerta's apartment building and at the door of her room with De La Huerta.

*4) Event in Los Angeles*

58.   Subsequently, about four weeks later, when De La Huerta was in Los Angeles in relation to the Golden Globe awards, WEINSTEIN was visiting, on information and belief, the Four Seasons Hotel on South Doheny Drive in Beverly Hills, California having drinks with several associates. De La Huerta has reported in her public statements that she received a call from WEINSTEIN to request that she join him and some of his associates for drinks with him at the hotel's lounge.

59.   De La Huerta and her friend Goli Samii who were nearby at the time of receiving the call, did travel to the Four Seasons hotel and De La Huerta has stated that she did this with the intent of confronting WEINSTEIN again to accuse him as a stalker and rapist. Samii can corroborate the occurrence of at least the meeting. Almost immediately – according to De La Huerta's statements - WEINSTEIN excused himself from the group and did not return. Shortly thereafter, a concierge of the hotel gave De La Huerta a note indicating that it was from WEINSTEIN, requesting her presence in his hotel room for any substantive discussion. De La Huerta has reported that WEINSTEIN opened the door, wearing an opened bathrobe thereby prominently exposing himself. De La Huerta told WEINSTEIN that was inappropriate behavior and complained to him of his prior bad behavior and quickly left the vicinity of WEINSTEIN's room feeling embarrassed, shocked and humiliated, rejoining her associate Samii in the lobby and thereupon departing.

60.   De La Huerta was extremely upset by the events and has been publicly documented as drinking very heavily on or around the date of the Los Angeles encounter in consequence of this further upsetting event. She has stated that over the following months she engaged in a stream of self-destructive behavior – much of which is well documented by media reports.

*5) Post Assault Retaliation by WEINSTEIN Against De La Huerta to Punish Her for Her Condemnation of His Rapes*

61.     At the time of the attacks, De La Huerta was in the second season of filming for Boardwalk Empire. Following these events, her contract for additional episodes and seasons of Boardwalk Empire was not renewed, although no reason was ever given by HBO for this discontinuation. On information and belief, TLPC here alleges that it believes that retaliatory action by WEINSTEIN played a critical role in the termination. Additionally and in consequence, De La continued to be fearful of further career harm throughout the film industry, if she proceeded with a lawsuit against WEINSTEIN. She subsequently – in 2014 – provided a detailed account which was reviewed by attorneys representing her at that time but she was too fearful to allow action to be taken.

62.     De La Huerta has publicly alleged that she had feared to press any charges or file any lawsuits against WEINSTEIN and TWC, because of statements and warnings made by WEINSTEIN during the course of the events in late 2010 and early 2011 that lack of cooperation on her part with his advances would harm her career.

63.     For the reasons set forth in the two prior paragraphs, WEINSTEIN and TWC would be equitably estopped from asserting the statute of limitations in the event that De La Huerta proceeds to file a California action against them. Unlike an employer where a person can evade future harms by changing employment, WEINSTEIN's pervasive role and impact in the film industry and awards events left no means to escape or terminate the reach of WEINSTEIN's ability to negatively influence her career.

*6) Legal Jeopardy Is Attached to THE WEINSTEIN COMPANY as well as to WEINSTEIN so that Both Were Motivated to Try to Undermine Efforts by Victims to Achieve Justice*

64.     TLPC believes, and upon such information and belief states that the criminal and intentional acts performed by Harvey WEINSTEIN have been alleged to have been endorsed by

-35-

1    THE WEINSTEIN COMPANY or to have been known to TWC in that, for instance, THE

2    WEINSTEIN COMPANY has been alleged to have funded hotel rooms wherein WEINSTEIN

3    would commit his lewd, forceful and unconsented acts. THE WEINSTEIN COMPANY

4    additionally has been alleged to have participated in setting up  meetings between WEINSTEIN

5    and De La Huerta with no asserted business purpose, including attempting to direct her to meet

6    WEINSTEIN at De La Huerta's home. TWC has also been alleged to have been the sole

7    possessor of knowledge of a pattern of sexual assaults by WEINSTEIN because of confidentiality

8    agreements formed to address other past allegations of sexual assaults, whose contents TWC

9    would have been aware of. For these reasons THE WEINSTEIN COMPANY faces liability and

10   would share with WEINSTEIN an interest in preventing legal actions seeking retribution,

11   compensation, and criminal conviction as to WEINSTEIN's sexual assaults. This would lead a

12   New York defense attorney specializing in the defense of rapists – e.g. RUBIN – to engage in

13   actions intended to make TWC aware of his services.

14

15   **B. Events Leading to DEFENDANTS' Liability In the Current Action**

16

17   65.    On October 14, 2017, following the numerous public reports of sexual assaults by

18   Harvey WEINSTEIN, Plaintiff TLPC was contacted by then current client Paz De La Huerta for

19   legal advice and representation in regard to the above mentioned assaults by WEINSTEIN. At

20   that time, Plaintiff TLPC was engaged in several active legal projects on behalf of De La Huerta

21   which had extended over a period of years.

22   66.    Plaintiff then agreed to proceed to represent De La Huerta in regard to all matters

23   in relation to WEINSTEIN under the terms of their existing contingency agreement which

24   allowed for addition of any project wherein both parties agreed to the representation. These

25   representations include contract and physical assault litigation against Lionsgate Films and certain

26   of its personnel, various personal legal matters on behalf of De La Huerta, contract negotiation for

27   film projects, assistance in the resolution of on-set creative disputes during active filming, and

28   assistance in developing funding for future projects to be produced & directed by De La Huerta.

67.     The work in relation to the WEINSTEIN action included the aspects of dealing with incoming requests from media – such as New York Times reporter Jodi Kantor - who had learned independently about the WEINSTEIN assaults due to statements made about the assaults by De La Huerta in 2014, and facilitating the work of Vanity Fair on its report about the WEINSTEIN assaults. This was in addition to intensive work to develop and investigate the substantive legal case. The substantive work involved identifying and interviewing various witnesses, searching for documents and images, examining various databases and researching locations, times and dates to establish irrefutable corroboration for key elements of the assaults.

68.     In addition, civil filings for New York and for California were drawn up. In light of the proposed litigation, an additional retainer agreement was drafted to explicitly include the services and the hourly rates for more recently employed additional attorneys with Tensor Law PC to be involved in the litigation who were not listed in the original retainer agreement although this update was not executed by De La Huerta – on information and belief – because RUBIN warned her not to sign.

69.     As the evidence collection process continued – ultimately involving more than a hundred hours of intensive legal work – it became apparent to Plaintiff TLPC that the elements and evidence should be sufficient to support a criminal prosecution. Therefore Plaintiff, on behalf of De La Huerta, initiated contacts with the New York Police Department on October 24 and 25, 2017 and then subsequently with the office the District Attorney in New York County in relation to the assaults by WEINSTEIN upon De La Huerta.  Because the NYPD and he NYDA expressed a high level of interest after their initial interviews with De La Huerta and preliminary discussion of the evidence, the very active and time intensive work by TLPC on evidence development and identification of witnesses accelerated.

70.     It should be noted that De La Huerta as an artist generally sustained a relationship with the law firm in which she was not intimately involved in legal details, contents of legal filings, details of interviews, the identity of various witnesses who contacted the law firm, evidence development, affidavits, examination of financial and business records, negotiations with other involved counsel, etc but only maintained a generalized high-level knowledge of the

details of the case. This was in part to shield her from excessive distraction and anxiety and allow her to continue to focus on her artistic projects.

71.     The work progressed with a very high level of success. De La Huerta received a very effective initial report of her story in Vanity Fair on November 2, 2017 which was followed by highly effective detailed prominent reports in the New York Times, CBS News and CNN, based on interviews arranged substantially through Tensor Law PC. Further, the NYPD and NYDA were convinced by the evidence and New York District Attorney Cyrus Vance issued a press release statement indicating the case was under active investigation. New York Mayor Bill de Blasio, together with New York Chief of Detectives Robert K. Boyce held a press conference on November 3rd, expressing a high level of confidence in De La Huerta's case against WEINSTEIN. All indications were that a Grand Jury would be convened, and an indictment of WEINSTEIN was imminent. The NYPD Detectives involved with the case stated a present readiness to seek an arrest of WEINSTEIN for criminal rape charges.

72.     At this point, RUBIN commenced his successful effort to derail and destroy the case, relying on subterfuge, misdirection, and misinformation. In addition, he worked to attempt to cause grievous personal harm to Plaintiff's client De La Huerta. He was able to simultaneously mislead and misinform the District Attorney's office and prevent further communication with the NYDA by Tensor Law by supplying De La Huerta with a series of false and defamatory statements causing her to panic and believe she must immediately discharge Tensor Law PC as counsel and proceed *without* representation. In addition, without making any effort to obtain the extensive files and evidentiary materials developed and held by Tensor Law PC in this matter, he proceeded to advise the NYDA that there was not sufficient evidence for an indictment. His communications with the NYDA office were also a subterfuge in that he represented himself to them as counsel for De La Huerta, while at the same time being careful to attempt to avoid liability by acting to assure that he was not in fact representing her. He later met with De La Huerta on November 12, in Seville, Spain and advised her she had no case and should withdraw her police complaint in order to avoid personal ruin.

73.     Because RUBIN issued his advice to the NYDA without first discussing the matter

with Tensor Law PC or obtaining the case file, it is provable that any advice to the NYDA and to De La Huerta was not based on and did not consider the full set of evidence held by De La Huerta's attorneys at TLPC. He acted *as if* he was serving in his usual capacity as an experienced criminal *defense attorney* serving to the benefit of WEINSTEIN while superficially maintaining a pretense of representing himself to De La Huerta as a victims support attorney. Even if RUBIN had occasionally done victims advocate work in the past, his website leaves no doubt about his primary business in the criminal arena and it makes no mention of the type of services he feigned to offer to De La Huerta.

74.     An attorney representing WEINSTEIN would be expected to contact the NY DA and advise them there was no case – without first acquainting himself with the evidence in hand. An attorney representing WEINSTEIN would be expected to act to hide his undermining communications with the client. In fact, based on statements by RUBIN to FILLER, RUBIN had repeatedly advised De La Huerta that he would use his superior knowledge and experience to assure that she accomplished her goals. However, RUBIN had advised De La Huerta that she must keep his involvement completely secret from her attorney, FILLER until the moment arrived when he would give her the go ahead to terminate the TLPC representation, which would come *AFTER* he had the psychotherapists records in his physical possession.

### C. Actions Of RUBIN to Attempt to Force a Waiver of De La Huerta's Patient-Psychotherapist Privilege as to Communications with SueAnne Piliero, PhD

*1) At the Time of RUBIN's Interference TLPC Was In The Midst of Pursuing a Critical Emergency Action to Defend De La Huerta's Extremely Important Privacy Interests*

75.     The timing for the attempted termination of all counsel for De La Huerta was set to attempt to disrupt, terminate and interfere with Tensor Law P.C.'s Emergency Motion to Quash the Subpoena of the New York District Attorney for two years of psychotherapy records comprising a thousand pages of dense material covering a wide variety of intensely personal material.  The timing was also set to allow RUBIN to attempt to cause a devastating and irremediable WAIVER of De La Huerta's Patient-Psychotherapist privilege. The information in

-39-

the records at issue not only affected De La Huerta, but included extraordinarily confidential information on various friends and associates of De La Huerta which she never imagined would go beyond her highly confidential and highly protected communications with her therapist. These efforts also included a brazen and astonishing effort by RUBIN to gain personal possession of the physical records which would allow him to surreptitiously copy and sell or distribute said records to WEINSTEIN.

76.     The issue of information held by the psychotherapist SueAnne Piliero, PhD only arose because of efforts to establish the exact date of the two New York assaults. Ultimately, it proved possible to identify these dates based on other evidence uncovered by De La Huerta and by Filler. De La Huerta contacted Piliero on October 17th, 2017 to request a statement as to the exact date and a contemporary corroboration that a sexual encounter had in fact occurred that caused severe acute distress to De La Huerta in the fall of 2010.

77.     Piliero responded on October 24th with an email stating that all records from 2010 and 2011 had been on her computer and they were all lost in a hard disk crash, with no backup and no recovery possible. Therefore, when De La Huerta met with the NYPD on October 25th and gave consent to access any existing medical records, the consent did not extend to the psychotherapy records which she believed were destroyed.

78.     Filler scheduled an interview with Piliero on November 6, 2017 at 4pm Eastern time and informed NY Assistant District Attorney Maxine Rosenthal of the interview. Rosenthal requested, and Filler agreed that Rosenthal could have the 4 pm appointment, but that he would interview Piliero at 5pm. Arrangements were made through Piliero's attorney Bruce Hillowe, Esq.

79.     However, around 10 pm on November 5th, Piliero discovered that she had been incorrect about the destruction of the records and that she had now found all of them. Hillowe then cancelled the Piliero interviews with Rosenthal and with Filler on the grounds they were unnecessary. Rosenthal then issued a subpoena for all of the found records and Hillowe replied by stating he had advised Piliero not to comply with the subpoena. Under New York law, the Patient-Psychotherapist privilege is at an even higher level than the general patient-physician

privilege and is more comparable to the attorney-client privilege. Rosenthal then responded with a Judicial "so-ordered" subpoena which would be sufficient to pierce the patient-psychotherapist privilege. Hillowe indicated he would instruct Piliero to comply, but that it would take 24 hours to prepare the records. Note that at this point, neither De La Huerta nor her counsel had seen the records.

80.     After further discussion between Filler and De La Huerta, and between Filler and Hillowe, Tensor Law planned to file an Emergency Motion to Quash the Subpoena as overbroad. De La Huerta sought to review the records and withhold any obviously irrelevant information that might be particularly humiliating, compromising or which might significantly invade the privacy of another person.  Discussions between Filler and Rosenthal on November 6 did not resolve the issue so Filler informed Rosenthal that the motion would be filed on November 7th by 4:30pm.

81.     In particular, TLPC was concerned by the November 6, 2017 issuance by New York Chief Administrative Judge of the Courts, Hon. Janet DiFiore of new rules 200.16 and 200.27 of the Uniform Rules of Courts Exercising Criminal Jurisdiction 22 NYCRR Part 200. This was an order "requiring judges to order prosecutors to search their files and disclosed all evidence favorable to the defense at least 30 days before major trials" according to a subsequent report in the New York Times:

https://www.nytimes.com/2017/11/08/nyregion/rule-would-push-prosecutors-to-release-evidence-favorable-to-defense.html

and see formal details at:

https://www.nycourts.gov/PRESS/PDFs/PR17_17.pdf

The Chief Judge's intent was to assure that New York Courts were fully in compliance with *Brady v. Maryland*, 373 U.S. 83 (1963) and other U.S. Supreme Court decisions intended to protect rights of defendants and reduce the risk of wrong convictions (see Exhibit B).

82.     After discussing the new rule with Rosenthal on the evening of November 6, 2017 TLPC felt that the subpoena was issued without due concern by Rosenthal for the impact of the new rule. Because defense attorneys in rape cases will tend to seek any evidence for attacking an accuser's reliability, they would likely succeed in getting access to De La Huerta's entire detailed

-41-

psychotherapy record set if the subpoena was applied as then written. At least in part, the new rule was intended directly to interfere with e.g. Rosenthal's past efforts to keep material from criminal defense attorneys. TLPC believed that his posed a direct unnecessary risk to De La Huerta's reasonable privacy concerns.

*2) RUBIN Initially Planned to Meet De La Huerta in Spain on November 12 to Discuss Her Case AFTER She Had Reviewed Her Records with Counsel*

83.     De La Huerta first contacted Filler to investigate RUBIN on November 4 and asked him to review emails from him on an ongoing basis. Historically, De La Huerta has felt she has been misled by various persons making offers and has employed Filler repeatedly to investigate those making offers, to provide advice on such offers, and to litigate against such offerors when she realizes she has been defrauded or misled. In the context of that investigation, and concerned about a possible fraudulent effort by RUBIN to get protected information from RUBIN, Filler became aware that RUBIN was proposing to come to Spain on November 12 to review her case with her after she and her counsel had seen the Piliero records. De La Huerta again contacted Filler on the morning of November 7 to draw his attention to additional emails from RUBIN to her and requested Filler's review and opinion regarding the proposed November 12 meeting.

*3) Rubin Decides to Surreptitiously Intervene and Intercept a Physical Copy of the Records*

84.     RUBIN then abruptly changed his plan on the afternoon of November 7th when Hillowe resisted turning over the records to RUBIN personally. Prior to this point, RUBIN had directed Paz to keep his involvement secret until AFTER he was able to see the records. Filler noted that RUBIN would provably have no privilege and so that De La Huerta's attorney – TLPC - would be interfered with. Effectively, by revealing a subterfuge – that RUBIN was an agent for a person adverse to De La Huerta, privilege and confidentiality would be voided. Throughout this period RUBIN maintained to De La Huerta that he was not formally offering to be retained by De La Huerta until after he reviewed the records.

85.     Essentially, as under California Rules of Professional Conduct 1.2:220 (and New York and ABA equivalents), no duty of confidentiality and no attorney client privilege arise when a duty of loyalty is already owed to an adverse client. Just to assure this, as under California Rules of Professional Conduct 1.2:230 an attorney is obligated to decline representation if he believes the case is not meritorious and he conspicuously informed at least third parties present at the Seville meeting – even at the start of the meeting – that he believed there was no valid criminal case. It was not the task of De La Huerta, - nor of non-attorney third parties present at the Seville meeting – to understand complex issues of attorney ethical rules. It was RUBIN's duty to avoid the situation, which he in fact aggressively sought – wherein he conducts a detailed interview with a client that he already believes to have no valid cause of action at the start of the interview. He should have contacted De La Huerta's attorney Filler before speaking with her by phone before November 9th and he should have contacted De La Huerta's attorney Goldberg before carrying out a detailed interview with her in person in Seville after November 9th. RUBIN was fully aware that De La Huerta had just retained expert specialized counsel – Carrie Goldberg – when he outrageously proceeded with his destructive and harmful subterfuge.

86.     To the extent that RUBIN continued to seek information from De La Huerta on November 12, 2017, he also interfered with TLPC's representation of De La Huerta in relation to TLPC's representation in the Lionsgate action and the non-disparagement work. Therefore, the November 12 actions, like the November 7 actions continued to interfere with TLPC's performance of its contract with De La Huerta despite explicit and affirmative direct warnings to RUBIN from TLPC on November 8 and November 9.

87.     Then, abandoning his plan for secrecy,  RUBIN purposely availed himself of the venue of California, by calling into California to speak to FILLER in his Santa Monica, California TLPC office at approximately 1:10 pm Pacific Time, November 7, 2017. RUBIN, incorrectly, informed FILLER that FILLER was terminated as counsel to De La Huerta, effective immediately and that he, RUBIN was now counsel. FILLER informed RUBIN that an EMERGENCY MOTION TO QUASH A JUDICIAL GRAND JURY SUPBPOENA was due to be filed in New York Supreme Court by 4:30 Eastern Time – within 20 minutes. RUBIN stated

-43-

that he was aware of this – because of prior discussions he had with Rosenthal - and instructed that FILLER must stand down from the California filing, and from the New York Motion. If the Motion had been filed it was to be withdrawn immediately. He stated no time available to discuss these orders because he had a further phone conference with the District Attorney at 4:15 Eastern on this matter.

88.     Filler then contacted De La Huerta and consulted on the counsel issue. Based on those discussion, Filler determined that the RUBIN was engaged in a fraud. He called RUBIN to confront him with the fact that he was not actually representing De La Huerta, which RUBIN then admitted. However, he further admitted that he had convinced De La Huerta to terminate representation by Tensor Law. Filler explained to RUBIN that Tensor Law represented her on several active matters and had enjoyed excellent appraisal and approval from De La Huerta on all of these matters up to that hour, that there was no indication of a termination other than his false statement.

89.     Filler also stated that even if RUBIN had convinced De La Huerta to go unrepresented, he would advise De La Huerta that because the motion was now filed and pending before the court – at least under California law – FILLER could not withdraw as counsel unless the judge either agreed to an emergency withdrawal or if a substitution could be arranged. FILLER informed RUBIN that he would advise De La Huerta that if she did wish to respect RUBIN'S advice to terminate Tensor Law as counsel, that she should immediately retain Carrie Goldberg who would have the greatest knowledge and experience about protecting the privacy of her records under New York law. Tensor Law would continue to represent until a signed notice from De La Huerta and a signed substitution from some other counsel such as Goldberg was received. This was because FILLER had a duty to protect De La Huerta from the severe personal harm that would befall her if her unfiltered, unredacted therapy records were made public.

90.     RUBIN expressed anger and stated he was on his way to Hillowe's office to take personal possession of the psychotherapy records and with that, RUBIN discontinued the conversation.

91.     Filler then immediately contacted Hillowe to learn of the status of the records.

-44-

Hillowe stated that he had been contacted by RUBIN and that RUBIN had informed him that there was a change in plans. RUBIN had stated he had authority to take personal physical possession of the records. Hillowe requested proof and RUBIN provided a one line email from De La Huerta saying it was OK for Piliero to turn the records over to RUBIN. Filler then informed Hillowe that RUBIN was not actually retained as counsel by De La Huerta. Thereupon Hillowe and Filler agreed that if RUBIN took possession of the records with De La Huerta's approval while RUBIN was not counsel – this would result in a waiver of the patient-therapist privilege because he would be classified as an unnecessary third party with no confidential relationship with De La Huerta. The only exception would be if RUBIN had provided documentation to establish himself as a messenger service, but that Hillowe had no such documentation. Therefore, Hillowe agreed to refuse to release the records to RUBIN when he arrived at Hillowe's office. Hillowe did have a copy of the records delivered only to Judge Charles H. Solomon, Part 82 of New York Supreme Court at 100 Centre Street, Room 1313, to where Tensor Law electronically delivered the Emergency Motion to Quash the Subpoena.

92.     Subsequently, on November 8, around 3:00 pm Pacific Time, Goldberg and De La Huerta arranged for representation and a substitution of Goldberg's firm for Tensor Law as to the WEINSTEIN matter was effected on November 9 around 10:00 am by execution by TLPC of a formal letter of substitution directed to Hon. Charles Solomon.

93.     On the afternoon of November 8,  WEINSTEIN announced that he had retained Blair Berk and Benjamin Brafman as defense counsel for the New York De La Huerta investigation. Brafman has publicly stated that he commences such a representation by providing information to the District Attorney to undermine the credibility of the accuser. Brafman immediately made a statement through a spokesperson on November 9 that he was certain there would be no indictment.

94.     Goldberg subsequently negotiated with Rosenthal and they reached an agreement on November 15th allowing Goldberg and De La Huerta to review the records and to withhold any papers that were of a high level of personal compromise but a low level of relevance to the WEINSTEIN matter. After this review, significant amounts of records were provided to the NY

-45-

DA.

95.     Nonetheless, although RUBIN was fully informed that Carrie Goldberg was serving as highly expert counsel to De La Huerta in the WEINSTEIN assault matter as of November 8, RUBIN again convinced De La Huerta to keep his further activities secret from Goldberg as he sought an electronic copy of the records. RUBIN then travelled to Seville, Spain where De La Huerta was staying at that time and on November 12, 2017 conducted an extensive, exacting, point by point interview with De La Huerta as to the facts and recollections as she understood them in relation to the assaults, which interview continued for more than three hours. At the end of the discussions that day, RUBIN informed at least other parties present at the meeting that he could not in fact offer to represent De La Huerta, and that she had no case that would support a complaint against WEINSTEIN. RUBIN did not obtain a copy of the records.

96.     However, by informing at least others present that there was no case, RUBIN created the circumstances for an action for a malicious prosecution action in defense of WEINSTEIN. The basis for such an action is that – at least through RUBIN's expert and knowledgeable opinion stated to others present at the meeting – De La Huerta was informed that she had no basis for pursuing an action against Weinstein. Should De La Huerta or the DA proceed, they would be doing so in the knowledge that their prosecution was malicious.

97.     Following RUBIN's visit to Spain to interview De La Huerta, WEINSTEIN's designated defense counsel – Benjamin Brafman was allowed to hold a private meeting with the New York District Attorney,  upon which Brafman issued a statement indicating that no indictment would be sought against WEINSTEIN by the District Attorney. The DA reportedly directed the NYPD to back off the investigation following the meeting with Brafman. Goldberg publicly protested the meeting with Brafman because she was not informed of the meeting and there was no indictment.

98.     On information and belief – Brafman used information obtained from De La Huerta by RUBIN for purposes of convincing the DA not to proceed. Of note, in 2015, it appeared that the NY DA was poised to indict WEINSTEIN when the NYPD obtained a recording of WEINSTEIN admitting to groping Ambra Battilana Gutierrez – who wore a wire

placed by the NYPD – and on which recording WEINSTEIN repeatedly implores Gutierrez to enter his hotel room to privately discuss her concerns. To defend himself at that time WEINSTEIN retained Elkan Abramowitz – a former law partner of NY DA Cyrus Vance and former US attorney (who contributed $26,450 to Vance's reelection campaign) and also retained Daniel S. Connolly – a former prosecutor. Connolly was an Assistant District Attorney in the office of the Manhattan District Attorney from 1986 to 1994. RUBIN was an Assistant District Attorney in the office of the Bronx District Attorney from 1986 through 1991. Thus, prior defense counsel of WEINSTEIN is a long time associate of RUBIN.

99.    WEINSTEIN also retained as consultant Linda Fairstein – a former Manhattan sex-crimes prosecutor who will have worked extensively with RUBIN over many years – usually on the opposite side of sex crimes which RUBIN regularly defended. Fairstein has been an associate of WEINSTEIN since 2007 when she met with him about developing a film based on her career as a sex crimes prosecutor. Fairstein has written about the case of serial rapist Fletcher Worrell who was defended by Michael Rubin, see Linda Fairstein, *The Most Surprising Crime Zone: Your Own Home – From the Files of Linda Fairstein – Lesson 2: Always Lock Your Doors* (2012).

100.    In 2015, WEINSTEIN managed to cause Fairstein to use her long-standing relationship with NY DA sex crimes prosecutor Martha Bashford (Chief of the New York DA's Office Sex Crimes Unit) to introduce and arrange a meeting between WEINSTEIN's criminal defense attorney Abramowitz and Bashford which resulted in the NY DA deciding not to prosecute WEINSTEIN in the Gutierrez case. For these reasons it is clear that WEINSTEIN has a recent similar pattern *modus operandi* of retaining and contacting former New York District Attorneys in order to help convince the current New York District Attorneys not to prosecute him – involving these attorneys as both official retained attorneys and as unofficial consultants. Further – the very individuals he employed for this purpose are associates of RUBIN. Here since Fairstein acted on WEINSTEIN's behalf to reduce his chance of prosecution in the Ambra Battilana Gutierrez matter, because she acted in 2015 on WEINSTEIN's behalf by contacting a present District Attorney, and because she is a person who at least knows of RUBIN, and most

likely worked opposite him on a number of cases, her pattern of action makes her a likely

intermediary in the effort to prevent an indictment of WEINSTEIN in the De La Huerta matter.

### D. Solicitation of A Represented Client By Tortious Means Voids Privilege

*1) Solicitation of Representation or Providing a Second Opinion Violates Professional Ethics if the Communication Contains False Information*

101.    In California, Rule 1-400 (B) & (D) of the *California Rules of Professional Conduct* govern the propriety of contacts with represented clients:

(B) For purposes of this rule, a "solicitation" means any communication:
　(1) Concerning the availability for professional employment of a member or a law firm in which a significant motive is pecuniary gain; and
　(2) Which is:
　　(a) delivered in person or by telephone, or
　　(b) directed by any means to a person known to the sender to be represented by counsel in a matter which is a subject of the communication.

(D) A communication or a solicitation (as defined herein) shall not:
　(1) Contain any untrue statement; or
　(2) Contain any matter, or present or arrange any matter in a manner or format which is false, deceptive, or which tends to confuse, deceive, or mislead

*California Rules of Professional Conduct*, Rule 1-400

102.    The American Bar Association provides guidance on a similar issue where the purpose is to render a second opinion rather than to attempt to solicit representation of an already represented client. This guidance obligates the opining attorney to undertake a complete review of the file before providing any advice – something which RUBIN failed to do, because he sought to provide advice secretly without attempting to learn of the contents of the file from TLPC:

Before giving a second opinion, the lawyer may find that in order to provide the best possible representation he should review the client's file, a complete copy of which may only be available through the client's current lawyer.

Whether or not particular communications between the lawyer and the represented person might be considered tortious interference with an existing lawyer-client relationship is a legal question, outside the scope of an ethics opinion.

https://www.americanbar.org/groups/professional_responsibility/services/ethicssearch/

ethicstipmay2017.html   *American Bar Association – Ethics Tips – Second Opinions* – May 2017.

103.    Similar limitation is specified in the *New York Rules of Professional Conduct* at

7.3 (a)(1) – "A lawyer shall not engage in solicitation: (2) by any form of communication if: (i)

the communication or contact violates Rule…7.1(a)" which states 7.1(a): "A lawyer or law firm

shall not use or disseminate or participate in the use or dissemination of any advertisement that:

(1) contains statements or claims that are false, deceptive or misleading."

104.    Here, it is alleged that RUBIN, acting with malice, using methods that constitute

oppression in the sense of reckless disregard and fraudulently advocated for and caused De La

Huerta to panic and urgently terminate her long time counsel Filler through three false, deceptive

and misleading claims: 1) it was harmful to De La Huerta's case against Weinstein for any press

coverage to occur – which appears to be opposite to the advice of the leading specialist in this

field Gloria Allred; 2) Filler was not licensed to practice in New York and would be practicing on

her behalf without a license – which was misleading because a Tensor Law PC partner – Alex

Straus is licensed to practice in New York and 3) he would need to protect her records by

carrying them personally to Spain – which was in fact a ruse to cause her to waive her evidentiary

privilege so the records would be available to WEINSTEIN and the public.

105.    One only needs to look to the action battle plan deployed by WEINSTEIN to

discredit and humiliate Ambra Battilana Gutierrez when she was pressing for a criminal

indictment –

> And it's interesting to see in that situation there was a whole team that swooped in to help
> Harvey fight that in a counterattack effort. There were private investigators who were
> dispatched to basically dig up dirt on her. There were stories planted in the tabloids to
> basically disparage her background…

Megan Twohey, New York Times Reporter– NPR November 15, 2017

> After Gutierrez contacted the police, Weinstein drew upon a network of high-powered
> defense lawyers, former law-enforcement officials, and private investigators who help the

wealthy try to thwart criminal investigations. Unbeknownst to her, Weinstein's attorneys hired K2 Intelligence, a firm founded by the corporate-intelligence magnate Jules Kroll, and tasked its agents with insuring that the Manhattan District Attorney, Cyrus Vance, did not press charges against Weinstein. One of Weinstein's defense lawyers, Elkan Abramowitz, whose clients include New York Governor Andrew Cuomo and who is a partner at the firm that formerly employed Vance, oversaw K2's work. The intelligence firm hired Italian private investigators to dig up information on Gutierrez's sexual history, according to three individuals with knowledge of its work. (A spokesperson for K2 said that the firm's work in the Gutierrez case involved only online and public-records searches regarding her past.)

The Italian investigators also claimed that Gutierrez engaged in prostitution.

Current and former K2 employees, *all of whom had previously worked at the District Attorney's office*, relayed the private investigators' information about Gutierrez in calls to prosecutors. Two K2 employees said that those contacts were part of a "revolving door" culture between the D.A. and high-priced private-investigation firms. Lawyers working for Weinstein also presented a dossier of the private investigator's findings to prosecutors in a face-to-face meeting. (Joan Vollero, a spokesperson for Vance's office, said that such interactions with defense attorneys are standard procedure.)

*Ronan Farrow, "Harvey Weinstein's Secret Settlements:* The New Yorker, November 21, 2017, see Exhibit M)

106.    Note that K2 Intelligence – who have worked to attack WEINSTEIN's accuser in the recent past employs six investigators who formerly worked in the New York District Attorney's office – including Robert Brenner, Jordan Arnold, Paul E. Ryan, Charles Lineham (who worked in RUBIN's sub-specialty area of construction crime), and Matthew E. Paul. The firm employs numerous former NYPD Detectives as well. Therefore, when RUBIN made a public statement about this law suit on January 6th, 2018, rather than deny that there was an undisclosed principal, he only asserted that he did not know Harvey Weinstein personally. Given the numerous former New York Assistant District Attorneys and former NYPD Detectives either employed by Weinstein or who are employed by his service providers – it is clear that RUBIN's statement of not knowing WEINSTEIN personally is wholly irrelevant to the question of whether he was positioned to provide information to e.g. K2 with which to smear De La Huerta as they did with Ambra Battilana Gutierrez.

107.    At the very least, it will have been Filler's obligation as De La Huerta's attorney to guard against any misdirection of psychotherapy records. Therefore, RUBIN's intensive,

invasive, secretive and wholly inappropriate efforts to obtain an "extra" physical copy of the records the moment the first copy left Hillowe's hands – constituted severe interference with TLPC's ability to carry out its duty with regard to its longtime client De La Huerta.

108.    TLPC also represented De La Huerta in a separate action De La Huerta v. Lionsgate at al. Filler was aware that release of the records could impair De La Huerta's case against Lionsgate (the Lionsgate case arose from events in 2011 and these records from Piliero covered that period of time). That representation continues presently. TLPC also represented De La Huerta in contract negotiations regarding mutual non-disparagement with various individuals and Filler was aware that release of the Piliero records by consent of De Le Huerta (which consent RUBIN sought to obtain) could possibly conflict with that undertaking. Filler specifically warned RUBIN in their November 7 phone call about these issues and RUBIN responded by expressing utter contempt and disregard for TLPC's obligations to protect De La Huerta's privacy and privilege with regard to the Piliero records.

109.    Note here that the consented release of records which RUBIN sought & obtained from De La Heurta on November 7, 2017 has wholly different effects on privilege and privacy than any production in response to a judicially ordered Grand Jury Subpoena. His maneuver put a general written consent for release in his hands, where no such proof of consent to release could have been obtained in any other way – a fact that immediately and gravely alarmed Filler. Although Filler was able to block and prevent Hillowe from acting on De La Huerta's written consent to release records, this engendered burdensome conflict with the client to convince her she had erred gravely in accepting and acting upon what she believed to be RUBIN's seemingly sage and helpful advice.

*4) RUBIN's Advice Against Reactive and Affirmative Provision of General Case Information to Media Resulted in Additional Burden and Conflict*

110.    The issue of active pre-emptive press presence is determined by the Ambra Battilana Gutierrez history. A number of media were recruited by WEINSTEIN to publish character destruction of Gutierrez. The decision of the District Attorney as to whether to proceed

1   with a prosecution is substantially based in law, but has a significant impact from news and

2   politics. For Gutierrez, a blast of negative reporting suggesting she was a prostitute and had prior

3   false rape allegations preceded the District Attorney's announcement that they would not

4   prosecute WEINSTEIN. This negative press was placed by WEINSTEIN operatives. The editor

5   of the National Enquirer was a participant.

6       111.    Counseling from RUBIN to De La Huerta to withdraw from the press completely,

7   make no statements, do no interviews and make no appearances was, on information and belief,

8   to open the field for negative reporting of De La Huerta. This conflicted directly and oppositely

9   from the advice of Filler. However, RUBIN strongly advocated for urgent efforts to halt all

10  communication with the press on the grounds that it would irreparably harm De La Huerta's

11  prospects. Previously, during the course of the Lionsgate litigation, De La Huerta – at critical

12  times – demonstrated an accurate understanding that appropriate press at appropriate times would

13  help her case. As a result, when Lionsgate came into court with an Anti-SLAPP action arguing

14  that it was protected speech to hit her with an ambulance because a stunt is part of artistic

15  expression, press was critical. De La Huerta had a courtroom full of media listening as the judge

16  was forced to reverse his position relative to the tentative ruling – and accept the arguments of her

17  legal team that the Screen Actors Guild contract dominated over the Lionsgate agreements and

18  that hitting an actress with a stunt vehicle is not a form of freedom of artistic expression.

19      112.    For the Gutierrez case K2 provided negative information to the press according to

20  Ronan Farrow:

21      She began to worry about her future. "I couldn't sleep, I couldn't eat," she told me. New York
22      tabloids, including the New York Post, to which Weinstein had fed stories in the past, had
        been publishing lurid reports about Gutierrez that mirrored the information in K2's dossier.
23
        Attorneys that Gutierrez consulted advised her to accept a settlement. "I felt pressured," she
24      told me. "I said no at first." Eventually, however, she relented. "I was forced by the fact that
        newspapers completely bashed me, by the fact that I was alone, by the fact that I was twenty-
25      two years old," Gutierrez told me. "I knew if he could move the press in this way, I couldn't
        fight him."
26
27  *Ronan Farrow, Harvey Weinstein's Secret Settlements,* The New Yorker, November 21, 2017.

28  WEINSTEIN also worked closely with Dylan Howard, the chief content officer for American

Media Inc., publisher of the *National Enquirer* – according to Farrow.

113.   WEINSTEIN also employs as his agents Michael S. Sitrick, Sallie Hofmeister and Holly Baird of Sitrick and Company as public relations spokespersons. Even as WEINSTEIN evades service of process of this lawsuit, he received a copy through his attorneys Blair Berk & Phyllis Kupferstein, read it and caused Holly Baird to make a public statement describing this lawsuit indicating it would be "insanity" to assert that he would spy on accusers or attempt to interfere with efforts to call him to account for his sexual assaults.

114.   For all of these reasons TLPC advocated an aggressive forward Press response presence in order to avoid creating a media vacuum, to quickly respond to and quash negative narratives, and show the immediate public light of day that any WEINSTEIN misbehavior would be exposed to.  TLPC was commissioned to act in this fashion. RUBIN strongly advocated no comments to the press under any circumstances and used his position on this to advocate for urgent termination of TLPC.

### E. A Nefarious Purpose Is Provable By The Steps Taken by RUBIN

115.   Plaintiff hereby alleges that RUBIN's actions cannot have been undertaken for the purpose of acting as an attorney representing the interests of De La Huerta. For these reasons, his actions fall under Section 4.2 of the American Bar Association Model Rules of Professional Contact which bar an attorney (RUBIN) retained by an adverse party (the Undisclosed Principal) from communicating about the subject of the representation with a person (De La Huerta) represented by counsel (Filler).

*1) No Attorney Client Privilege Arises From an Attorney's Contacts With an Opposing Client*

116.   Importantly such a representation would violate the duty of loyalty to the first client (the Undisclosed Principal) with the result of being a "simultaneous representation" that causes a "per se" or "automatic" disqualification of the attorney, see *Flatt v. Superior Court* 9 Cal.4th 275, 284 (1995). The result of this automatic disqualification is that no attorney-client privilege is formed, even if the second client is unaware that a prospective attorney is actually acting secretly as an investigating attorney for an Undisclosed Principal (first client) whose

interests are adverse on the matter at hand. In essence, any act undertaken by the attorney that brings an actual advantage to the potential second client (De La Huerta) would violate the duty of loyalty to the first client.

117.    It is axiomatic that no attorney client privilege results when an adverse party's attorney communicates with the opposing party. The automatic disqualification principal of *Flatt, supra*, additionally means that even if the attorney wanted to simultaneously represent opposing parties, the second engagement fails automatically and no attorney client privilege results.

*2) Lacking Any Attorney-Client Privilege RUBIN Could Not Obtain a Copy of De La Huerta's Records Without Waiving Her Patient-Psychotherapist Privilege*

118.    Either as the agent of an undisclosed principal or as an independent actor seeking to harm De La Huerta's criminal case against WEINSTEIN there was no privilege in effect for RUBIN. Therefore, when – through the application of deceit – RUBIN convinced De La Huerta to direct Hillowe to provide a copy of the psycho-therapy records of Piliero to RUBIN, his action was intended to cause a permanent and irreparable destruction of the patient-psychotherapist privilege.

119.    Revealing to the public hundreds of pages of intimate personal details of the thoughts and experiences of a victim of a sexual assault is an action well understood to a person of RUBIN's occupation as a sex crimes defense attorney. This is done to humiliate the victim and to undermine her as a witness. There would be no reasonable basis to believe that RUBIN had informed De La Huerta that this was his intention.

*3) Even to Render a Second Opinion – a Full Review of the Case File Was Required*

120.    The records so aggressively sought by RUBIN were of very low evidentiary or probative value as to the strength of the case against WEINSTEIN. However, they were of very high probability of harm to the emotional state of De La Huerta.

121.    In contrast, in order to form a second opinion about the management of the case, RUBIN will have needed to see and review hundreds of pages of evidence and corroborative data & evidence in the case file held by her attorney Filler but RUBIN made no effort to review the

evidence. Additional corroborating witnesses who were identified to Filler were not referred to De La Huerta personally, so she would not be a source of that relevant information for RUBIN in formulating an opinion. Under the American Bar Association advice from the ABA Center for Professional Responsibility (May 2017) the guidance is as follows:

> Before giving a second opinion, the lawyer may find that in order to provide the best possible representation he should review the client's file, a complete copy of which may only be available through the client's current lawyer.

*Peter Geraghty, Ethics Search Director, American Bar Association, Ethics Tip* May 2017: americanbar.org/groups/professional_responsibility/services/ethicssearch/ethicstipmay2017.html

122.    Thus, it appears that RUBIN's plan to keep his involvement secret while providing opinions to De La Huerta was done for nefarious purposes and not for the purpose of providing the best possible opinions.  Ultimately – and without reviewing any case files and without consulting with De La Huerta's new attorney Goldberg, Rubin rendered the opinion that there was no valid case so that he could not offer representation – making this clear to at least others present at this meeting with De La Huerta in Seville, Spain on November 12, 2017.

*4) Initial Investigation of RUBIN by Filler*

123.    Although RUBIN instructed De La Huerta to keep his activities secret and although he continued to believe his actions were secret, Filler was instructed by De La Huerta on November 4 and again on November 7 to commence an investigation of RUBIN. The investigation was similar to prior work Filler had done to assure against manipulation of De La Huerta's legal efforts in her litigation against Lionsgate. The purpose of the investigation was to learn if RUBIN was acting on WEINSTEIN's behalf with an intention to prepare for litigation against RUBIN if evidence of collusion with WEINSTEIN was identified.

> From: Michael F. Rubin <MFR@kellyrubin.com>          Nov 6 at 8:06 AM
> To: Paz De La Huerta
>
> Ok... I'll send a request to Bruce with a cc to your therapist and suggest that your therapist scan and email the records to you so we can review when we meet. Hopefully the records can be sent to you in time for our meeting this week.

*As for Filler, I've looked into him a bit and unless I'm missing something, I don't think he is admitted to practice law in NY. Unless he's pushing you to sign a retainer, l suggest not telling him anything until you and I meet.*


-------------------------


Michael F. Rubin MFR@kellyrubin.com                     Nov 6 at 12:30 pm
To:  Paz De La Huerta

I just spoke to Bruce Hillowe, counsel for your therapist. I'm told that the records are being processed and will be sent to you electronically by tomorrow. I also understand that Mr. Hillowe has been in touch with the DA about the delay in production of the records and why. For now, I don't see a reason to speak to the detective ... the ADA is the one running the investigation, not the detective... and as long as she is informed, that's fine.
I suggest that you forward the records to me after you get them, so I can go over them and then we can discuss any concerns there may be. I'd like to get the records reviewed and sent to the DA asap because I don't want the DA to wondering about the reason for the delay ... other than what she was told by Mr. Hillowe.

Emails of November 6 obtained in an initial investigation of RUBIN.

124.    Note that as of November 6th (Monday) at 12:30 pm EST, it was Rubin's stated intention to get the records electronically from Paz. However, by the following day, November 7, he had decided to seek to collect paper copy directly from Bruce Hillowe. This was at a time when numerous media were reporting that an indictment was expected within 24 hours.

**Michael F. Rubin** <MFR@kellyrubin.com>        Nov 7 at 2:24 PM  ☆

To  paz            com, bvhillowe@mindspring.com

Paz:
        Please OK for Mr. Hillowe to have me bring a copy your records
with me to Spain. He needs your OK to send them to me to bring to you

Michael F. Rubin, Esq.
Kelly & Rubin, LLP.
40 WALL STREET
25TH FLOOR
New York, NY 10005

212.691.9393
mfr@kellyrubin.com
www.kellyrubin.com

**Paz De La Huerta**   Yes I approve Michael Rub:        Nov 7 at 3:31 PM  ☆

**Michael F. Rubin** <MFR@kellyrubin.com>        Nov 7 at 3:42 PM  ☆

To  Paz De La Huerta

CC  bvhillowe@mindspring.com

Bruce
Hopefully it's not too late to send the messenger tomorrow with an extra
set of records for me to bring to Spain. Please let me know

Michael Rubin

Figure 5 – Emails of November 7, 2017 noting RUBIN's change of plans to attempt to obtain a paper copy of De La Huerta's records in a fashion that would waive privilige

*5) Summary of Evidence of Actions by RUBIN Against De La Huerta's Chosen Course to*

*Advance the WEINSTEIN Criminal Complaint*

        125.    Firstly, aside from the interference with contractual relations, RUBIN's intent was to interfere with De La Huerta's progress towards a criminal indictment of Weinstein by 1) convincing her of an urgent need to immediately terminate her counsel and to go unrepresented (he subsequently refused to offer to represent her after he had interviewed her extensively on Nov. 12); 2) attempting to cause a waiver of the evidentiary privilege that protected De La Huerta's psychotherapy records from public release; 3) attempted to physically gain possession of

-57-
VERIFIED COMPLAINT of Tensor Law P.C. vs. Michael Rubin, Harvey WEINSTEIN, et al

an "extra" paper copy of De La Huerta's psychotherapy records before she or her attorney Filler

would see the electronic copy – he could then be the first to have a copy to sell to an undisclosed

principal; 4) a frantic and intensive effort to halt or evade TLPC's Emergency Motion to Quash

the Subpoena for the Piliero records; 5) after causing her to terminate counsel, making her records

public and probably completing a sale of the records, then – on November 12 - advise her she had

no case to pursue against WEINSTEIN.

**F. Destruction of Evidence by The Weinstein Company Warrants a Default Judgment**

126.    Plaintiff herein alleges that during October and November of 2017, THE

WEINSTEIN COMPANY and HARVEY WEINSTEIN as well as possibly other defendants such

as RUBIN, BC STRATEGY (UK and Israel), and K2 INTELLIGENCE all involved in

aggressive destruction of documents in anticipation of litigation.

127.    Generally, under California Law there is no longer any tort of spoliation of

evidence since it was abolished by the California Supreme Court in *Cedars Sinai Medical Center*

*v. Superior Court*, 18 Cal.4th 1,17 (1998). Even were it to exist it would likely parallel the current

regimen of combatting this practice by allowing jury instructions with a negative inference only

for destruction after a case is filed and a warning letter against evidence destruction has been

received by the Defendant, or even – not until discovery requests have been served. The situation

is similar in New York, see *Krin v. Lenox Hill Hosp.*, 88 A.D.3d 597 (2011).

128.    However, this is considered procedural law from the point of view of an Erie

analysis so that Federal law controls when a case is heard in United States District Court. Under

Federal Law, sanctions are more severe. Further, intentional spoliation of evidence prior to

commencement of litigation may be severe if the party involved can be shown to have had

reasonable expectation that litigation was imminent and that the evidence being destroyed would

be directly relevant to the anticipated litigation.

129.    This situation arises in relation to the landmark case of *Kronisch v. United States*

150 F.3d 112 (2nd Cir., 1998). In the 1950's the CIA administered LSD to twenty four

unsuspecting individuals (by offering a drink in a social situation, that had been laced with LSD),

some of which acts were conducted in the US and some on ex-patriates who were overseas when

they were offered a drink secretly laced with drug. When the U.S. Senate investigated this in the late 1970's, the CIA was forced to divulge the names of the Americans who were given the drug when in the U.S. but the CIA kept secret the names of those Americans involved when overseas. Kronisch was given the drug when in Paris. As the CIA was sued by those victims in the U.S., it destroyed evidence that could have been used to support legal actions by those victimized overseas. The District Court granted summary judgment against Kronisch's estate because they could not obtain evidence to prove the CIA's act due to the CIA's intentional spoliation of evidence carried out for the purpose of frustrating litigation against it. The Second Circuit reversed, finding that circumstantial evidence and an adverse inference could be provided to the jury even though the spoliation took place before Kronisch sued.

130.    The duty to preserve evidence commences as soon a the party knows or reasonably should now that litigation is imminent and that the documents being destroyed are likely to be relevant to the litigation, see *In re Napster, Inc. Copyright Litigation, 462 F.Supp.2d 1060 (9th Cir., 2006)*:

> When considering a default sanction in response to spoliation of evidence, the court must determine "(1) the existence of certain extraordinary circumstances, (2) the presence of willfulness, bad faith, or fault by the offending party, (3) the efficacy of lesser sanctions, [and] (4) the relationship or nexus between the misconduct drawing the [default] sanction and the matters in controversy in the case." *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380 (9th Cir.1988) . In addition, the court may consider the prejudice to the moving party as an "optional" consideration where appropriate. Id.  This multi-factor test is not "a mechanical means of determining what discovery sanction is just," but rather "a way for a district judge to think about what to do." *Valley Engineers, Inc. v. Electric Eng'g Co*., 158 F.3d 1051, 1057 (9th Cir.1998) .

*In re Napster* at 1070.

131.    The extraordinary circumstances apply to situations that appear to apply to the current matter:

> Dismissal under a court's inherent powers is justified in extreme circumstances." Id.  In the Ninth Circuit, "extraordinary circumstances exist where there is a pattern of disregard for Court orders and deceptive litigation tactics that threaten to interfere with the rightful decision of a case." See *Advantacare Health Partners, LP v. Access IV*, No. C 03-04496 JF, 2004 WL 1837997 at \*5 (N.D.Cal. Aug.17, 2004)  (Fogel, J.) (citing *Halaco*, 843 F.2d at 381). *See also Anheuser- Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir.1995) (holding that it is "well settled that dismissal is warranted where ... a party has engaged

1   deliberately in deceptive practices that undermine the integrity of judicial proceedings"); *Wyle*
2   *v. R.J. Reynolds Tobacco Co.*, 709 F.2d 585, 591 (9th Cir.1983) (upholding dismissal where
    the district court determined that "the deliberate deception and irreparable loss of material
3   evidence justified the sanction of dismissal");

4   *In re Napster* at 1071.

5       132.    In the current matter, beginning in the first week of October of 2017, Harvey

6   WEINSTEIN and certain employees of THE WEINSTEIN COMPANY, commenced a frantic

7   effort to destroy evidence that could be used to support litigation against WEINSTEIN and/or

8   TWC. This effort was publicly disclosed on January 17, 2018 in an article in Vanity Fair by

9   Adam Ciralsky. He reports that a statement was provided by TWC stating:

10      [Frank] Gil – [Vice President of Human Resources] entered the offices of TWC employees
        without their knowledge and may have been responsible for the disappearance of personnel
11      files." Those offices, sources said, belonged to T.W.C. president and chief operating officer
        David Glasser and Irwin Reiter, the company's comptroller.
12

13  *Adam Ciralsky, "Harvey's Concern Was Who Did Him In": Inside Harvey Weinstein's Frantic*

14  *Final Days,* Vanity Fair, January 17, 2018, see Exhibit L.

15      133.    The author of the article goes on to report:

16      The next day, October 6, [Frank Gil] and Weinstein spoke by phone and Gil supposedly made
        a proposition, as recounted by sources familiar with the call and the events that followed. Gil,
17      they said, offered to provide proof—in exchange for a seven-figure payment—that T.W.C.
        president and C.O.O. David Glasser and Weinstein's brother, Bob, had been the ones who had
18      leaked damaging details to the press…Reiter's computer may have been accessed without his
        consent
19

20  *Adam Ciralsky, "Harvey's Concern Was Who Did Him In": Inside Harvey Weinstein's Frantic*

21  *Final Days,* Vanity Fair, January 17, 2018. For these reasons, it is likely that contracts for the

22  sub-rosa collection of information from accusers may have been intentionally destroyed for the

23  purpose of frustrating imminent litigation. This reveals a pattern, that led New York Attorney

24  General Eric Shneiderman to prevent the sale of TWC until its leadership had been removed. The

25  termination of TWC CEO David Glasser was announced on February 16, 2018, apparently in

26  response to Schneiderman's demands.

27      134.    Default sanctions will be sought against at least TWC to the extent that any

28

significant destruction of relevant documents can be confirmed:

> Litigants owe an "uncompromising duty to preserve" what they know or reasonably should know will be relevant evidence in a pending lawsuit, or one in the offing, even though no discovery request or order to preserve the evidence has yet been made.

*Schwarzer, Tashima & Wagstaffe, Rutter Group Prac. Guide: Federal Civ. Pro. Before Trial*, (The Rutter Group - June 2016 Update) Ch. 11(I)-C, ¶ 11:125.

## V. FIRST CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP

**(as against RUBIN, alternatively upon election against any Undisclosed Principal & against DOES 1 to 50)**

135.     Plaintiff realleges and incorporates by reference as though fully set forth herein, each and every allegation set forth above in this Complaint.

136.     The standard for an action in tort for interference with contractual relations was reviewed by the California Supreme Court in *Quelimane Co. v Stewart Title Guaranty Co.*, 19 Cal. 4th 26 (1998):

> "The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pacific Gas & Electric Co. v. Bear Stearns & Co.* 50 Cal. 3d 1118, 1126, (1990).

*Quelimane* at 55.

137.     As a preliminary matter, it is worth noting that a critical difference between the California elements for intentional interference with contract (IIC) as opposed to the elements for the intentional interference with prospective economic advantage (IIPEA), is that no wrongful conduct needs to be shown for IIC. The higher standard for IIPEA is intended to assure that there is no cause of action amongst parties simply competing for business. In the current matter, however, RUBIN was not seeking to represent De La Huerta, and he was not seeking to promote

her interest in seeing that an indictment of WEINSTEIN resulted. Rather, his purpose was to disrupt the case against WEINSTEIN by fraudulently representing himself to De La Huerta as a prospective attorney. In essence his purpose was not to compete with FILLER for the business of representing De La Huerta, rather his purpose was to deprive De La Huerta of counsel at the time her critical Motion to Quash was filed and to disrupt the efforts of Filler to perform effectively as De La Huerta's attorney generally in the effort to seek justice as to WEINSTEIN's assaults against her.

### A. An Actual Valid Contract Existed

138.    Firstly **(1)**, the Plaintiff's case must be based on **actual valid contracts** between Plaintiff and a third party. This element is met because Plaintiff Tensor Law P.C. entered into an open ended formal detailed contingency representation contract with De La Huerta on May 29, 2015 which included the statement "Our agreeing to provide any additional representation will be in our sole and absolute discretion." In the current matter De La Huerta requested representation and Plaintiff TLPC agreed, then proceeded to provide more than a hundred hours of intensive legal effort with outstanding success in advancing De La Huerta's goals.

139.    She obtained impeccable positive and very highly positioned media coverage for her statement in Vanity Fair, the New York Times, CBS and CNN from leading journalists. The follow on included thousands of reports. Her claim against WEINSTEIN achieved particularly wide coverage because of all of the hundreds of accusers of WEINSTEIN and others similarly situated, only hers resulted in a powerful endorsement of the likelihood of prosecution. Rather than relying only on her own statements or comments of an attorney such as Gloria Allred, instead De La Huerta's accusations, together with evidence developed by Tensor Law PC, were endorsed by the District Attorney of New York County, Cyrus Vance, as well as by Bill de Blasio, Mayor of New York City and by Robert K. Boyce, Chief of Detectives of New York. WEINSTEIN was put in fear of his liberty by affirmative statements from the NYPD that he faced imminent arrest if he attempted to return to his home in New York. Scores of other media

-62-

VERIFIED COMPLAINT of Tensor Law P.C. vs. Michael Rubin, Harvey WEINSTEIN, et al

sought further interviews with De La Huerta. Note that circumstances have changed, but when she relied on other New York counsel to try to get coverage and action for the exact same accusations in 2014, no press coverage and no legal action resulted. It is evident that a contract existed for legal services and that it was being performed with a very high level of competence and success by Tensor Law P.C. Even if there had been no actual written contract, it is still the case that documented offer acceptance consideration and performance demonstrably existed.

### B. DEFENDANTS Had Knowledge of the Contract

140.   **Knowledge of the contracts (2)** is required, but California law does not require that the tortfeasor have knowledge of the parties of the contract or the terms of the contract. All that is required is that the defendant have knowledge that contracts exist that are substantially certain to be interfered with in consequence of defendant's intentional action. Here, RUBIN reveals awareness of the contract because he sent email writings to De La Huerta specifically instructing her not to inform Filler of RUBIN's activities. Further, extensive media coverage of De La Huerta's case included citation to Filler as her attorney in this matter. The fact that he reached out to contact her in Spain shows that he became aware of the WEINSTEIN accusation involving De La Huerta and is unlikely to have avoided entirely seeing any of the coverage in the New York Times, CNN, CBS, NBC Today/Megyn Kelly as well as thousands of follow on media reports. Further, De La Huerta will have certainly informed him immediately that she had representation and Hillowe was certain to have informed him that De La Huerta had representation. Although it is true that an additional revised retainer agreement specifying hourly rates for additional attorneys at Tensor Law had been provided, the existence of a contract was already obvious to RUBIN.

141.   In *Sebastian International v. Russolillo* 162 F.Supp.2d 1198 (C.D. Cal 2001) the Court held that it is not necessary to allege the individual contracts in detail, rather it is sufficient to reasonably show that Defendant was "on notice" as to the class of contracts with which their actions were substantially certain to interfere:

"The Court finds that this evidence supports the Plaintiff's assertion that the Defendants were "on notice" as to the class of contracting salons and distributors with whom Sebastian has contractual relations, and that it can be reasonably inferred from such notice that Defendants had knowledge of the class of contractual relations potentially disrupted by their actions. Therefore, the Court finds that there is sufficient evidence to support the second element of Plaintiff's claim for interference with contractual relations."

*Sebastian*, at 1204.

142.    In *Sebastian*, the Court states that this view follows California law through it's citation of *Ramona Manor Convalescent v. Care Enterprises*, 177 Cal.App.3d 1120, 1131 (1986). The Court in *Ramona* ruled that a holdover lessee could interfere even though it did not know the identity of the new lessee whose possession was affected:

"We are not persuaded knowledge of the injured party's specific identity or name is a prerequisite to recovery for either IIK or IIPEA.  Care failed to quote another passage found in the same section and the same comment which qualifies the portion it did quote and which seems to us dispositive of the point: "The rule does not require, however, that the person who loses the performance of the contract as a result of the conduct of the actor should be specifically mentioned by name. It is sufficient that he is identified in some manner...." *Restatement 2nd of Torts, § 766*, com. p, pp. 15–16.

Care's decision to hold over beyond the termination of the lease under which it had possession was made with the knowledge that such action would frustrate the legitimate contractual expectations of a specific, albeit unnamed, new lessee. That is all it was required to know to incur liability."

*Ramona* at 1133. In the current matter, it is not only clear that RUBIN knew the general type of contract that would underlie a high profile high stakes litigation such as the claims of De La Huerta against WEINSTEIN, but that RUBIN knew of Filler. Further RUBIN states in an email to De La Huerta that he has investigated FILLER, then going on to provide incorrect information about Tensor Law PC to De La Huerta, such as a false assertion that Tensor Law PC could not represent her in New York.

143.    This position of the court in *Ramona* is also relied on in *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1092 (9th Cir. 2005) where the 9th District cites *Sebastian* and also cites *Ramona* stating:

"When the defendant performs the act that causes the interference, the defendant need not know exactly who is a party to the contract, so long as he knows he is interfering with a contractual relationship."

*Altera* at 1092. Thus, even if RUBIN was not aware of New York Attorney Alex Strauss who is a partner in Tensor Law PC it was sufficient that RUBIN knew this was a law firm representing De La Huerta and that Tensor Law PC had filed an Emergency Motion to Quash the Grand Jury Subpoena in the Supreme Court of New York, Department 82.

## C. DEFENDANTS Engaged In Specific Intentional Acts Intended To Disrupt And Interfere With The Performance Of The Contract By FILLER And By TENSOR LAW P.C.

144.    The plaintiff must plead **(3)** defendant's **intentional acts designed to induce a breach** or disruption of the contractual relation. The intent & design at issue, under California Law, is an intent to perform some act which results in the interference, but there is no requirement that it is defendant's intention to interfere with the contract - it is only necessary that the intentional act does result in the interference and that a reasonable party in the defendant's position would be *substantially certain* that such interference would result. Further, Intentional Causation of Breach is a separate tort, so that Intentional Interference only requires that performance be made more difficult rather than requiring that an actual specific breach of contract be induced.

> "To establish the claim, the plaintiff need not prove that a defendant acted with the primary purpose of disrupting the contract, but must show the defendant's knowledge that the interference was certain or substantially certain to occur as a result of his or her action." (*Quelimane Co. v. Stewart Title Guaranty Co*. (1998) 19 Cal.4th 26, 56, 77 Cal.Rptr.2d 709, 960 P.2d 513.)

*Reeves v. Hanlon* 33 Cal.4th 1140, 1148 (2004). Thus, even if RUBIN somehow believed that his direct instructions to De La Huerta to terminate Filler and Tensor Law was not done for the purpose of disrupting Plaintiff's contract with De La Huerta, he will have known that disruption would be substantially certain to occur if she accepted his advice and followed his instructions.

145.    The emails from Rubin are not privileged and show that he advised Hillowe to provide him with a copy of the records at issues. All of the emails cited are a product of an

investigation of RUBIN undertaken by Filler at the direction of De La Huerta for the purpose of preparing for litigation where the emails would form the evidence if collusion on WEINSTEIN's behalf was found. In fact, because of the speed of events, RUBIN convinced De La Huerta to terminate TLPC abruptly before a full investigation of RUBIN could be completed. RUBIN's shift of plans after 3:00 pm EST on November 7 to seek to seize a physical copy of the records was accompanied by a high level of pressure on De La Huerta from Rubin to immediately terminate TLPC.

146. Specifically there are four intentional acts that are complained of and alleged as interference as follows: 1) RUBIN attempted to obtain a physical copy of the psychotherapy records of Paz De La Huerta on November 7, 2017 and this attempt interfered with TLPC's performance of its contract which obligated TLPC to avoid and prevent such a release; 2) RUBIN called TLPC to fraudulently inform TLPC it was terminated as counsel and must stop work; 3) RUBIN induced De La Huerta to attempt to terminate TLPC's representation of her as to the WEINSTEIN matter to become pro se while a critical court hearing was pending which TLPC had filed and was responsible to appear for; 4) RUBIN sought to compromise, obtain and destroy privilege for a wide extent of personal matters from De La Huerta during RUBIN's visit to De La Huerta in Seville, Spain on November 12, 2017 involving extensive information for which TLPC had a continuing duty & responsibility to assure remained personal and confidential to De La Huerta.

### D. The Intentional Acts of DEFENDANTS were Wrongful And Unjustified

147. Plaintiff also must reasonably assert that the **(3b)** Defendant's **intentional act was either unlawful** (e.g. constituted defamation) or **if lawful, that it was unjustified** :

"Thus, the jury may infer culpable intent from conduct substantially certain to interfere with the contract or prospective economic relationship...[A] cause of action under either tort theory will lie for the intentional interference by a third person with a contractual relationship either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification."

1
2

*Savage v. Pacific Gas & Electric Co.*, 21 Cal App 4th 434, 449 (1993).

3
4
5
6

148.    Here – the tort is really split into two species. In one version – the defendant charged with interference is a competitor trying to compete for the same customer and who may have a competition privilege, while in the other species, the defendant is simply intent on damaging the plaintiff's business activity.

7
8
9
10
11
12
13
14
15
16
17

149.    The latter type is the basis of the original case that led to the introduction of this tort – *Garret v. Taylor*, Cro. Jac. 567, 79 Eng. Rep. 485 (Kings Bench 1620) (see Exhibit G). In that case, Garret mined and finished building stones at a quarry he owned. Taylor to discredit Garret and deprive him of income, would stand before the quarry entrance and threaten mayhem and threaten to sue anyone who came to buy stones and any workmen trying to report to work at the quarry. Because the customers stayed away and the workman were afraid to enter, the court determined that there was a cause of action even though there was no defamation and no one was actually physically assaulted. It doesn't matter if Taylor was a competitor or if he was an angry customer – he is not damaging Garret by offering a competing service, rather, the damage is effected by warning potential customers that they will suffer if they continue to do business with Garret.

18

*1) No Competition Privilege Should Apply*

19
20
21
22
23
24

150.    The current matter may appear to be a competition case superficially, but RUBIN was not offering to substitute for TLPC. Rather he issued several warnings that led De La Huerta to fear immediate harm if she did not urgently terminate TLPC.  RUBIN did not agree to even consider being retained until he had a chance to review the records and to meet with De La Huerta in the future. When the meeting arrived, he declared he could not represent her because she did not have a case.

25
26
27

151.    Here, one can readily see that RUBIN would reasonably have waited to recommend terminating TLPC until after he had decided he was interested in taking the case and willing to be retained – if it was a matter of competitive interference. However, he induced De La

28

1   Huerta to terminate TLPC by alleging that features of the TLPC representation would be

2   immediately harmful to her case, rather than by suggesting that she switch/substitute to use him

3   as her attorney instead – therefore it is a pure interference case and it is not necessary to prove a

4   wrongful act to overcome any competition privilege.

5          152.    The competition privilege is applicable in a cause of action for intentional

6   interference with prospective economic advantage, but is not generally applicable for intentional

7   interference with contractual relations, see *San Francisco Design Center Associates v. Portman*

8   *Companies,* 41 Cal.App.4th 29,  43 (1995). It is also applicable for at will contracts see  *Reeves v.*

9   *Hanlon,* 33 Cal.4th 1140, 1149 (2004). If RUBIN's intention was to provide a second opinion

10  initially and was actually considering representation at the time that TLPC's contract was

11  interfered with, then he could allege that he only later decided not to take the case as he learned

12  more about it.

13         153.    More particularly however TLPC herein alleges that, RUBIN sought to effect his

14  second opinion advice by directly ordering TLPC not to file or if filed to withdraw its Emergency

15  Motion to Quash the Subpoena. To do this he appreciated that he would need to fraudulently pose

16  as having been hired as counsel as of November 7. However, there is a difference between

17  considering a case for a second opinion to the client and being able to issue an effective direction

18  to another attorney who actually is representing the client. Here, RUBIN called into California to

19  order Filler to take an action – thereby practicing law without a license in California.

20  Additionally, and importantly he fraudulently represented himself as having taken over as counsel

21  and as having been retained as counsel by De La Huerta. He did not assert a consulting or co-

22  counsel relationship. He asserted a replacement. Hillowe refused to give the records copy to

23  RUBIN because RUBIN could not show he was in a position to override Filler's direction, even

24  though RUBIN clearly sought to direct Hillowe to provide an extra paper copy of the records

25  directly to him.

26         154.    There can be no ambiguity about the fact that RUBIN was NEVER in a position to

27  override a plan of action from Filler or Goldberg because he was NEVER retained as counsel.

28  Although the status – if it indeed existed – of being prospective counsel might confer a duty of

confidentiality and might confer some sort of attorney-client privilege, it does not confer a power to override and direct the actions of actual existing counsel. Even his plan to panic De La Huerta into terminating TLPC urgently would only take effect once a substitution with another attorney occurred because there was a pending motion before the court of Hon. Charles Solomon. Therefore, RUBIN fraudulently claimed to be in a position of retained counsel when he ordered Filler to instruct his associate to withdraw the already filed motion. In this case he was impersonating retained counsel of De La Huerta although he was most likely retained on behalf of WEINSTEIN, or at best a second opinion or prospective attorney of De La Huerta.

155.    This is wrongful conduct of sufficient degree to override any competition privilege even if such privilege applies. The fraud is proven because RUBIN unsuccessfully ordered Hillowe to ignore TLPC's direction to send an electronic copy of the records to TLPC in Santa Monica.  This was based on a representation to Hillowe that his directions superseded the directions of TLPC which Hillowe had been honoring. It would obviously have been preposterous and ridiculous to Hillowe if RUBIN had identified himself as a prospective attorney or second opinion attorney ordering him to ignore the directions of TLPC. To effect this, RUBIN fraudulently represented himself as retained counsel to Filler, to Hillowe and to Rosenthal on the afternoon of November 7. This is fraud and supports punitive damages. The fraud itself was an interference with TLPC's ability to perform under a contract that continued to require TLPC to act as De La Huerta counsel at that time.

156.    A second fraud was by RUBIN against De La Huerta where he informed her she must and could immediately terminate representation by TLPC by sending a text. In California, with a motion pending before a court after counsel has appeared, approval from the court is required even to proceed with a substitution, and particularly for a proposed transition from being represented to appearing pro se with a critical high stakes motion about to be heard by the court, see *Filbin v. Fitzgerald* 211 Cal.App.4[th] 154, 170 (2012). Therefore, RUBIN's instructions to De La Huerta were fraudulent. Further his attempts to convince Filler and Hillowe that a sudden change from representation to pro se had occurred and that he could as a prospective or second opinion counsel order the withdrawal of a motion filed by retained and appeared counsel. This

only appears as a frantic desperate effort to convince De La Huerta, Filler and Hillowe to immediately allow him to come to Hillowe's office and get a paper copy of the psychotherapy records. He suggests that this is so that the DA will not be frustrated by having to wait a day or two but this is not only completely unconvincing, but simply in violation of rule and statute.

157.    This is not a matter of RUBIN simply being unaware of California law. An even more strict requirement is in force in New York under CPLR §321. Under CPLR §321(a) a consent to the Substitution of Attorney form must be signed at least by the withdrawing attorney and the party. However, here, CPLR §321(2) applies requiring a noticed motion to obtain an order of the court, *see Centurion Capital Corp v. Guarino* 35 Misc.3d 1219(A) *4 (NY Civ, 2012) and *General Accident Fire & Life Assurance Corp. v. North American Systems, Inc*., 216 A.D.2d 725,726 (NY Appellate Division, 1995). RUBIN made no effort to provide or obtain a Consent to Change Counsel Form – but rather hoped to obtain the records through a ruse. This also would have likely waived privilege since he relied on false non-existent authority to override the direction of counsel in order to attempt to seize the records. Both Hillowe and Filler advised him he was acting improperly upon which he became enraged pointlessly and unsuccessfully demanding the records.

### 2) Wrongful and Unjustified Advice as to an Urgent Need to Terminate All Representation

158.    Here, it is reasonably asserted that DEFENDANTS could not interfere by giving truthful information to De La Huerta. However, it is abundantly clear that it was not DEFENDANT'S intent to provide truthful information. Firstly, we have the prima facie fact of the spectacular success of the three weeks of representation – which **a)** allowed De La Huerta to tell her story through the most *prominent and well positioned media* in the world, wherein she had received little or no media coverage for several years (other than coverage of her Lionsgate litigation); **b)** exceeded the success of all other famous powerful and well represented accusers (including Ashley Judd, Rose McGowan, Gwyneth Paltrow, Angelina Jolie, Rosanna Arquette, Lupito Nyong'o and Kate Beckinsale) and even the most famous attorney in this field – Gloria Allred - by *putting WEINSTEIN on direct notice of possible <u>imminent arrest</u>* if he returned to his

home, and **c)** *obtaining public statements of endorsement* of her case by the New York County District Attorney, The Mayor of New York City and the Chief of Detectives of New York City with **d)** all leading to *imminent empaneling of a Grand Jury and likely indictment* – an immanency revealed by District Attorney Rosenthal's urgent rush to seize all of De La Huerta's records before De La Huerta even had a chance to review them. To the extent that all of this success flowed directly from De La Huerta, rather that from joint work with her counsel, the actions of counsel clearly did not impede or limit her success in any demonstrable fashion.

159.    In the light of the facts set forth in the previous paragraph we can consider the veracity of RUBIN's advice that representation by Filler and Tensor Law must be immediately terminated if she was to have any chance of success. Thus, RUBIN must have known his advice was untruthful and clearly rose to the level of a set of defamatory statements, particularly in the light of the previous five years of professional cooperation and trust between Filler and De La Huerta. Even if no defamatory statements were made, the comments and advice to De La Huerta that she must protect her claim by immediately becoming unrepresented were clearly unjustified in light of the facts.

160.    Further, advising De La Huerta to become unrepresented just after filing of her crucial Emergency Motion to Quash the Grand Jury Subpoena was unjustified as well as reckless and unconscionable, not to mention impossible without approval of the court to become pro se at that point in time. For many affected women, the very reason that they do not report rapes and that they do not seek criminal prosecution of rapists is that there is little personal benefit from a criminal conviction – other than a sense of justice achieved – while they risk having every potentially embarrassing detail of their personal and private lives put on public display and attacked by defense counsel. This is particularly the case for a celebrity such as Paz De La Huerta who will likely find any negative or embarrassing life detail in her psychotherapy records plastered across tabloids and thousands of web pages around the world – an experience she has encountered previously.

161.    Therefore, for good reason, total public release of portions of these records - totally unrelated to the WEINSTEIN prosecution - is among her greatest concerns. As her

attorney, (and as her physician) Filler has a primary responsibility to protect this information from unnecessary public release. Operationally for the success of the case, there was a valid concern that potential embarrassment would lead De La Huerta to withdraw from the prosecution – an unconscionable success for WEINSTEIN at further intimidating and humiliating his victims - which De La Huerta would reasonably have relied upon her attorney to prevent. It is not even the case that there necessarily was any information in the records that was so harmful, but that there is extensive and unfiltered intimacy of conversation over hundreds and hundreds of pages of the records.

*3) RUBIN'S Plan to Create a Devastating and Irremediable Waiver of De La Huerta's Patient-Psychotherapist privilege.*

162.    Also directly on point as to false and wrongful behavior was RUBIN's plan to cause a devastating and irremediable waiver of De La Huerta's Patient-Psychotherapist privilege while Filler was still counsel responsible for helping to protect that privilege. It should be clear that breach of that privilege would not only render the identified Piliero records as open to public access, but would affect all psychotherapy records from any period in her life, in New York, in California and elsewhere. An example of a deeply personal set of information would be her discussions with her therapist around the time of the death of her ex-boyfriend, Stone Temple Pilots lead singer Scott Weiland. There is nothing wrongful or inappropriate, but this is the type of intensely personal information that would be laid bare despite a high level of public interest.

163.    In California, the Patient-Psychotherapist privilege is set forth in California Evidence Code §1014. It is held by the patient, it applies to both psychologists and psychiatrists, and it differs from the general Patient-Physician privilege in that it applies to criminal actions as well as to civil actions. In New York, the Patient-Psychotherapist privilege – which is set forth in New York Consolidated Laws, Civil Practice Law & Rules (CPLR) §4507 is even more substantive in that is comparable to the attorney client privilege, so that it can only be crossed by a "so ordered" subpoena from a judge. The reason for the high level of deference is that courts

have understood that discussions with a therapist reach into the mind of the patient in a way that exposes far more in the realm of legal relevance than might be revealed by routine medical information.

164.    WAIVER of the Patient-Psychotherapist Privilege in California is covered under California Evidence Code §912:

> The right of any person to claim a privilege provided by Section…1014…is waived with respect to a communication protected by the privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to disclosure made by anyone. Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure, including failure to claim the privilege in any proceeding in which the holder has legal standing and the opportunity to claim the privilege

Importantly to understanding _RUBIN's shocking conduct_ is that the privilege is not waived if the records are released to a third party unintentionally or by any deceit. The release must be documented as having been done by a direct intentional writing by the holder of the privilege – e.g. De La Huerta in this situation. Therefore, when RUBIN obtained a one-line email from De La Huerta authorizing release to him, the intentional release requirement to accomplish WAIVER was met.

165.    Further, in California, the release does not damage the privilege if is released to a person with whom the patient holds a different privilege where reasonably necessary. This would mean that it could be released to a persons' attorney without effecting waiver if there was a necessary purpose for allowing the attorney to see the records – such as Carrie Goldberg's review of the records to help cooperate with District Attorney Rosenthal by identifying and removing irrelevant material. However, RUBIN made sure that De La Huerta would keep RUBIN's involvement secret from FILLER and to keep any discontinuation of FILLER's representation secret until the records were in RUBIN's hands. This would make it possible to prove that at the time that they were obtained by RUBIN, he was not De La Huerta's attorney. Further, to meet the letter of the law to show that his receipt of the physical records was not "necessary" he arranged to receive them in paper form on November 7, 2017 so that he could personally deliver them by

hand to De La Huerta in Seville, Spain on November 12, 2017. Prior to this, De La Huerta expected to receive them as a securely transmitted PDF to reach her on the 7th, five days earlier than RUBIN'S personal record delivery could accomplish. Therefore, RUBIN's physical receipt of the records coupled with a statement that he would not review them until he met in person with De La Huerta in Spain were calculated to assure that WAIVER was caused.

166.    In New York, we can look to the 2015, 6th edition of the New York State Bar Association text "*Evidentiary Privileges:  Grand Jury, Criminal, and Civil Trials" by Lawrence N. Gray, Esq*. which covers this issue at page 41, §3.9:

> As to waiver by document transfer generally, it has been held that "voluntary disclosure of privileged material subject to the attorney-client privilege to unnecessary third parties . . . 'waives the privilege, not only as to the specific communication disclosed but often as to all other communications relating to the same subject matter.' "111

[111]*In re Sealed Case*, 116 F.3d 550, 562 (D.C. Cir., 1997). Thus it is apparent that had RUBIN convinced Hillowe to transfer to him the documents with an approval from De La Huerta, for the unnecessary purpose of taking five days to deliver them to her personally in Spain, then De La Huerta would have waived privilege – possibly on all patient psychotherapist records where anything that might be relevant might appears. Worse, since it would have been a blanket release of records on all subjects discussed with her therapist over the two-year period, the waiver as to other years might well be completely unrestricted.

### 4) The Wrongful Nature of RUBIN's Actions to Cause Waiver of Privilege

167.    This attempted act was wrongful because RUBIN directly encouraged De La Huerta to do this completely unnecessary and very harmful direction to Piliero to agree to an unnecessary release of De La Huerta's records to this third party. RUBIN did not advise De La Huerta of the consequences. This wrongfully violates a duty to inform a person of the consequences of such a release. There was no benefit to De La Huerta. Without RUBIN's attempted intervention, the records would have reached De La Huerta and De La Huerta's attorney in electronic format within a few hours.  Therefore, the actions were completely

1    unnecessary.

2        168.    The duty clearly pertains to an attorney who is representing the person when  he

3    encourages his own client to commit an act resulting in a waiver of attorney-client privilege. As

4    with any evidentiary privilege, a lay person is not expected to fully understand the significance of

5    evidentiary privileges and nor is such a person expected to understand waiver. Therefore, in

6    directing De La Huerta to cooperate in a series of acts that would result in waiver of her patient-

7    therapist privilege, RUBIN committed a wrongful act. Like any individual, De La Huerta has

8    never manifested a desire to release all of her medical records to the public and did not realize

9    that this would be the results of the action that RUBIN advised her to take.

10       169.    RUBIN might argue that he had no fiduciary duty nor any duty at all because he

11   was not representing De La Huerta, never offered to represent her and in fact refused to represent

12   her. This only proves that his wrongful conduct can be treated as fraud instead of breach of duty

13   since he made a false statement – that De La Huerta should or must commit actions resulting in

14   harmful waiver – that De La Huerta relied on these knowingly false statements and that she

15   would have suffered harm due to her reliance. The fact that FILLER and Hillowe intervened and

16   prevented RUBIN from obtaining the records does not relieve these actions from being

17   considered as wrongdoing from the point of view of meeting the elements of the cause of action

18   for intentional interference with contractual relations.

19       170.    Having the records in his possession with an undertaking to show them to De La

20   Huerta in Spain five days later would provide ample time for RUBIN to copy, market and sell

21   these records. RUBIN knew through widespread media accounts that WEINSTEIN expended two

22   million dollars to attempt to discourage other actions by his accusers – including the actions of

23   David Boies, Esq. in retaining "Black Cube" to intimidate New York Times reporters and various

24   accusers. Further, the contracts offered to Black Cube include "success fees" for obtaining

25   documents:

26       The July agreement included several "success fees" if Black Cube met its goals. *The firm*
27       *would* *receive an additional three hundred thousand dollars if the* agency "*provides*
         *intelligence which will directly contribute to the efforts to completely stop* the Article from
28       being published at all in any shape or form."

1   *Ronan Farrow, Harvey Weinstein's Army of Spies*, The New Yorker, November 7, 2017 (see the

2   Black Cube contract, executed by David Boies at Exhibit F, p4 ¶16 and ¶17 & Exhibit I).

3       171.   Therefore, a reasonable person in RUBIN's position would have calculated that

4   WEINSTEIN would have been prepared to pay considerable sums of money for a full set of De

5   La Huerta's psychotherapy records on November 7, 2017 as a Grand Jury indictment appeared to

6   be imminent. Even if no physical copy was made and no copy was sold, RUBIN would have

7   physical proof that De La Huerta's privilege had been waived by express consent. This would

8   allow WEINSTEIN to subpoena these records, and in fact might allow any person to seek to

9   obtain them – such as news media. Alternately, RUBIN could reasonably be believed to have

10  made a deal in advance with WEINSTEIN or through an intermediary wherein RUBIN would be

11  paid if he could succeed in obtaining a usable waiver for De La Huerta's psychotherapy records

12  and perhaps an additional sum of money for a copy of the actual records that could not be traced

13  to the PDF version prepared by Piliero.

14      172.   Importantly, getting the paper copy would more effectively cause waiver. The

15  legal concept of waiver, see *2015, 6th edition of the New York State Bar Association*; "*Evidentiary

16  Privileges: Grand Jury, Criminal, and Civil Trials" by Lawrence N. Gray, Esq*. page 41, §3.9

17  requires a showing that the records were provided to a third party for no necessary reason. These

18  records were scanned into a PDF to reach Filler and De La Huerta instantly on November 7. The

19  "extra" paper copy provided to RUBIN for personal delivery to Spain was obviously unnecessary.

20      173.   If we try to imagine an innocent and positive explanation of RUBIN's actions, that

21  effort is unavailing. Firstly, could RUBIN have believed that some harm would come to De La

22  Huerta or to her case if the records had been delivered to her longtime attorney and physician

23  FILLER as planned? Could RUBIN have believed it would be beneficial to De La Huerta to

24  unnecessarily and permanently waive her patient-psychotherapist privilege? Could RUBIN have

25  believed it was beneficial to De La Huerta to have no attorney at all as Judge Solomon considered

26  release of her psychotherapist records at a hearing on her motion? Could RUBIN have believed

27  he should be communicating about the case with Assistant District Attorney Maxine Rosenthal –

28  at a time that announcement of empanelling of a Grand Jury seemed imminent - when at the time

-76-

of the communication RUBIN was not representing De La Huerta? Would it be unreasonable to ask WHO's interest RUBIN was acting on behalf of in his astonishing and truly shocking actions? Any reasonable attorney or lay person would reasonably believe that the only benefit would accrue to WEINSTEIN (or to THE WEINSTEIN COMPANY or MIRAMAX) on his behalf.

174.   More importantly, we can consider whether RUBIN was in fact naïve and uneducated with regard to the handling of a rape victim's psychotherapy record. Sadly, it cannot be held to be convincing that RUBIN did not understand exactly what he was doing. Firstly, he had served for several years as a prosecutor in the Bronx County office of the District Attorney. Then for nearly 20 years, he worked as Defense counsel defending rapists to try to prevent their indictment or conviction. On his own website he states that in his efforts to protect someone accused of raping a child he states:

> *We understand what prosecutors are looking for and what mistakes they are capable of* as they pursue a conviction. We work with private investigators and interview witnesses to determine the credibility of the charges against you. *We look into social media, text messages, credit card statements, prior relationships and any other indicators* that may affect the outcome of your case

Helping Minimize the Consequences of Child Sex Crimes, by Michael F. Rubin, Esq. at http://www.kellyrubin.com/Criminal-Law/Sexual-Assault/Child-Sex-Crimes.shtml (see also the figure between paragraph 4 & 5 above  in case RUBIN has taken down this web page). From the words on his website, it is clear that RUBIN understands well the task of defense counsel hired by an accused rapist for obtaining the mental health records of his client's accuser.

### 5) Litigation Privilege Does Not Apply Because It Does Not Protect Statements to Third Parties Not Involved in the Litigation, Nor Does It Protect Certain Statements to the Press

175.   The potential for application of litigation privilege will have very little usefulness for any potential efforts to suppress critical evidence in this matter for several reasons. Many critical communications were made to third parties or in the presence of third parties not having any interest in any potential litigation. For instance, Bruce Hillowe and his client SueAnne Piliero

had no stake or interest in any lawsuit or criminal prosecution. Obtaining and reviewing medical records is specifically found to be outside of the litigation privilege:

> For the reasons explained above, we conclude the litigation privilege does not shield defendants from liability for reading and disseminating Susan S.'s private mental health records for the purpose of gathering evidence to be used in the course of a criminal proceeding.

*Susan S. v. Israels*, 55 Cal.App.4th 1290, 1301 (1997).

176.     Further when De La Huerta directed Filler to examine these emails with a third party for the purpose of investigating RUBIN no litigation privilege was implicated, see *Wise v. Thrifty Payless Inc.* 83 Cal.App.4th 1296, 1304 (2000). The underlying communication related to an effort by a patient to obtain her records from her psychotherapist. RUBIN's actions in this event were not part of any action to affect the Grand Jury Subpoena, but rather were directed at the irrelevant purpose of obtaining an extra paper copy of the records for the purpose of destroying privilege. Similarly, communication between RUBIN and third parties not necessary to the litigation – with whom he spoke with in Spain on November 12th - do not implicate an absolute litigation privilege.

*6) Neither Litigation Privilege nor True and Nor and Fair & True Reporting Privilege Protects RUBIN's False and Wrongful Statements to Media*

177.     A further critical piece of evidence of an independently sufficient act of wrongdoing concerns RUBIN's false statements to various persons stating that FILLER had been terminated and was misrepresenting himself as counsel to De La Huerta. This communication, made by RUBIN to Clare Hiler of NBC news on November 8, 2017 is not protected by litigation privilege because statements made to the press are not generally protected by litigation privilege:

> For the litigation privilege to apply, there must be a sufficient nexus between the statement and the litigation. Specifically, the statement must "achieve the objects of the litigation," which requires that it "be connected with, or have some logical relation to the action." (*Silberg [v. Anderson],[...]*, 50 Cal.3d at pp. 212, 219–220, 266 Cal.Rptr. 638, 786 P.2d 365 [(1990)]).

see *Argentieri v. Zuckerberg,* 8 Cal.App.5th 768, 785 (2017)

[T]he litigation privilege should not be extended to " 'litigating in the press.'"

*Id* at 784.

178.     No Fair and True Reporting Privilege applies to RUBIN's statement because he knew the statement to Hiler was false at the time he made it. Filler's previous statements to the press were true statements made in good faith and were made for a legitimate litigation related purpose, *see Argentieri at* 778. That purpose was reasonable and special to the particular task of attempting to protect the De La Huerta's criminal complaint by acting to preempt, prevent and disrupt a repetition of the complex, aggressive, demoralizing and successful efforts to discredit Ambra Battilana Gutierrez in 2015.

179.     Those 2015 efforts were made by WEINSTEIN to derail a prospective indictment and he orchestrated the efforts through his agents LINDA FAIRSTEIN, BLACK CUBE (B.C. Strategy UK LTD) and K2 Intelligence, LLC. Those efforts took advantage of a trusting and unknowing media to report statements that helped lead the New York District Attorney not to seek an indictment for WEINSTEIN's assault on Gutierrez. RUBIN's statement was made solely to falsely discredit Filler. Filler, by contrast, held a good faith belief at that time and continues to hold such a belief that the RUBIN's purpose in his desperate attempts to obtain an extra paper copy of De La Huerta's psychotherapy records was to provide information to adversaries that could be used to discredit De La Huerta through a repetition of WEINSTEIN's modus operandi (*see supra* ¶105). Because of the identified risk, it was clearly Filler's continuing duty at that time to take all reasonable efforts to disrupt wrongful efforts to access and wrongful efforts to make public De La Huerta's records. Use of a public announcement by Filler was the most effective means to disrupt WEINSTEINS "Army of Spies" - to use the descriptive term for WEINSTEIN's methodology that was rightly applied by Ronan Farrow, Esq.

**E) RUBIN'S Actions Have Resulted In Severe or Negatively Dispositive Interference with Progress Towards Indictment of WEINSTEIN**

*1) An Actual Disruption is Alleged Which Made The Necessary Work More Burdensome to*

*Perform*

180.    Plaintiff must allege **(4) an actual breach or disruption of the contractual relationship**. It is not necessary that the contracts be fully breached, but only that their performance is made more difficult or expensive:

["T]he California courts have made clear that "interference" does not necessarily require evidence of any "breach." In *Ramona*, the court noted that the California Supreme Court had previously expanded the tort of inducing breach of contract "to permit liability where the defendant does not literally induce a breach of contract, but makes plaintiff's performance of the contract 'more expensive or burdensome.' *Ramona*, 177 Cal.App.3d at 1131, 225 Cal.Rptr. 120 (quoting *Lipman v. Brisbane Elementary Sch. Dist.*, 55 Cal.2d 224, 232, 11 Cal.Rptr. 97, 359 P.2d 465 (1961)). Therefore, in order to satisfy this element, Plaintiffs have to offer credible evidence that Defendants intentional actions resulted in greater expense or burden on the performance of its contractual obligations with third parties."

*Sebastian*, 162 F.Supp.2d 1198, 1204-5 (C.D. Cal 2001).

"Plaintiff need not allege an actual or inevitable breach of contract in order to state a claim for disruption of contractual relations. We have recognized that interference with the plaintiff's performance may give rise to a claim for interference with contractual relations if plaintiff's performance is made more costly or more burdensome. (*See Seaman's Direct Buying Service, Inc. v. Standard Oil Co.*, *supra*, 36 Cal. 3d 752, 766 (1984) ; *Lipman v. Brisbane Elementary Sch. Dist.* (1961) 55 Cal.2d 224, 232 [11 Cal. Rptr. 97, 359 P.2d 465] ; see also *Ramona Manor Convalescent Hospital v. Care Enterprises, supra*, 177 Cal. App. 3d at pp. 1130-1131 [holdover tenant liable for interference with landlord's contractual relations with new tenant].) Other cases have pointed out that while the tort of inducing breach of contract requires proof of a breach, the cause of action for interference with contractual relations is distinct and requires only proof of interference. (*Shamblin v. Berge* (1985) 166 Cal. App. 3d 118 [212 Cal. Rptr. 313] [defendant warned off potential buyers of real estate, causing rescission of sales contract]; *Manor Investment Co. v. F.W. Woolworth Co.* 159 Cal. App. 3d 58 (1984), 593, fn. 3 [206 Cal. Rptr. 37] [termination of at will license could be basis for action for intentional interference with contractual relations, but judgment reversed because inconsistent verdicts]; see also Rest.2d Torts, supra, § 766A , at p. 17 & coms. c and g, at pp. 18-19; *Prosser & Keeton*, Torts, supra , § 129, at pp. 991-992; Note, *Civil Conspiracy and Interference with Contractual Relations* (1975) 8 Loyola L.A. L. Rev. 302, 314, fn. 45; Comment, *Interference with Contractual Relations: A Property Limitation* (1966) 18 Stan. L. Rev. 1406.)

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1129 (1990)

181.    Here, TLPC alleges an actual interference and disruption when, on November 7th at 1:10 pm Pacific Time, RUBIN called into FILLER's office and falsely ordered him to halt work, cancel legal filings and or act to withdraw whatever had been filed. He then proceeded to interfere by contacting the New York District Attorney – Maxine Rosenthal – to provide false

-80-

information including the mis-statement that FILLER was no longer representing De La Huerta, that he RUBIN was now counsel, that the Motion to Quash was withdrawn, and further incorrect characterizations of the status, fundamentals and facts of the De La Huerta complaint against WEINSTEIN. FILLER then contacted Rosenthal who indicated confusion about who was counsel, and raised concern about the implications of this confusion for the prospects of going forward to seek indictment of WEINSTEIN. This created an abrupt loss of momentum and loss of confidence as to De La Huerta's consistency as a witness should the case go forward because of the appearance of confusion or conflicting instructions to two attorneys alleged to arise with De La Huerta.

182.    In fact, none of these communications should have been made by RUBIN – to the extent that the information was substantially incorrect – and to the extent that it was highly improper and inexplicable that he should be speaking to the District Attorney for the purpose of sewing confusion. At no time should a second opinion or prospective replacement attorney discuss the case with the District Attorney. This made the objective of proceeding towards an indictment far more difficult. Indeed, several days later – on information and belief – he advised the district attorney not to proceed with the indictment. This advisement occurred after FILLER agreed to substitute Goldberg in as counsel. All of the active investigation and witness development that FILLER had in progress were interrupted and brought to a halt – most of which were never resumed. That is –RUBIN was not interested at all in learning about the ongoing investigation, identity of witnesses or other facts of the case. He was only interested in disruption. The complete failure to request any transfer of case files or to inquire about the investigations underway by FILLER showed a complete lack of interest in progressing this case of extremely high national significance. Even later, over the next four days – as RUBIN continued to purport to De La Huerta that he was seeking the indictment – he made no effort to obtain case information from FILLER.

183.    By the time that RUBIN was speaking with De La Huerta on November 12 and making the determination that he should inform De La Huerta and the District Attorney that there was no case and that De La Huerta should withdraw her complaint – FILLER had already spent

-81-

hours providing details to Goldberg and her legal team and had transferred more than a thousand documents relevant to the case. Separately, Goldberg's review of the psychotherapist records provided to her by Piliero's counsel revealed a vast amount of intensely personal information as to many other issues of personal interest to De La Huerta, with only a tiny fraction of those documents having any relevance or potential interest value for the District Attorney. RUBIN had access to none of this information when he made his "determination" and "recommendation."

184.    These facts would lead any reasonable attorney to believe that RUBIN had no actual purpose of advancing the case for indictment of WEINSTEIN. RUBIN demonstrated no care or caution to avoid or prevent his activities from interfering with TLPC or with De La Huerta's case. There is an implied duty not to disrupt current counsel as he seeks to promote himself as a replacement for his own commercial reasons. Rather RUBIN's sole intentions in these actions – on their apparent face - were to a) *interfere with work on this matter at Tensor Law PC* and so to b) *interfere with prevent and obstruct* the likelihood of indictment of WEINSTEIN and to c) *harm and interfere* with FILLER's standing with De La Huerta, convincing her she should d) attempt to urgently and immediately *become unrepresented* while her critical Motion to Quash was considered by the Court. During this period, as his subsequent actions reveal, he did not actually intend to take over as counsel.

185.    RUBIN's actions were designed to cause De La Huerta to believe that it was his practice to meet with a client in person and to interview the client before agreeing to consider commencing a representation – this was to explain why he advised her to terminate representation by TLPC immediately at a time when he was not willing to offer representation. In fact, on information and belief, he did not ever provide an offer to De La Huerta that would giver her the power to accept him as counsel.

186.    No privilege was established by RUBIN with De La Huerta because he was an unsolicited advisor, who had first informed her he was unwilling to take over as counsel until he visited her in person and then upon meeting with her – simply informed her that he refused to consider being retained because he did not believe she had a case. This advice was made without any attempt to obtain transfer of the voluminous evidence held by TLPC nor any attempt to

proceed with the investigations and witness contacts underway at TLPC on November 8 which were abruptly halted at RUBINs direction to De La Huerta. Therefore, his communications were entirely for the purpose of damaging her case and damaging her relationship with her longstanding attorney, FILLER, and then to proceed immediately to commence undermining De La Huerta's confidence in her new attorney Goldberg.

187.    In this, RUBIN took care to avoid incurring any responsibility for protecting information provided to him by De La Huerta. By making clear to her from the time of his initial contact, that he was not prepared to consider becoming her attorney, and then – after interviewing her for several hours under false pretenses – informed her that he was refusing to represent her because "she had no case" and must withdraw her complaint. Because this was and is presently the only active criminal investigation of WEINSTEIN close to resulting in an indictment, RUBIN's effort, and because of the national prominence and societal importance of this potential criminal prosecution, this tampering and interference was and is a matter of very significant public concern, far beyond and in addition to any limitation to personal concerns of De La Huerta.

188.    Under California law – causing the termination of even an at will contract is a "break in contract," caused by interference that meets the standard of interference under this cause of action and that the cause of action is also subject to being pursued as an interference with prospective economic advantage as an aspect of interference with a business relationship:

> The great weight of authority is that the tort of interference with contract is merely a species of the broader tort of interference with prospective economic advantage. [Citations.] Thus, while the elements of the two actions are similar, the existence of a legally binding agreement is not a *sine qua non*  to the maintenance of a suit based on the more inclusive wrong." (*Buckaloo*, [*v. Johnson*] *supra*, 14 Cal.3d 823 (1975), 122 Cal.Rptr. 745, 537 P.2d 865,  fn. omitted.) The *Buckaloo*  court also cited with approval the following language from *Builders Corporation of America v. United States* 148 F.Supp. 482 (N.D.Cal.1957) :  "Both the tort of interference with contract relations and the tort of interference with prospective contract or business relations involve basically the same conduct on the part of the tortfeasor. In one case the interference takes place when a contract is already in existence, in the other, when a contract would, with certainty, have been consummated but for the conduct of the tortfeasor ...." (Id., at p. 484, fn. 1.)

*Manor Investment Co v. FW Woolworth* 159 Cal.App.3d 586, 593 (1984). This is viewed in the

light of *Reeves v. Hanlon*, *supra*, in the sense that an "at will" contract can be viewed as a situation where any renewal, from time to time, can be viewed as a business expectation subject to interference:

> [W]e hold that inducing the termination of an at-will employment relation may be actionable under the standard applicable to claims for intentional interference with prospective economic advantage.

*Reeves* at 1144.

> May the tort of interference with contractual relations be predicated upon interference with an at-will contract? Historically, the answer is yes. A third party's "interference with an at-will contract is actionable interference with the contractual relationship" because the contractual relationship is at the will of the parties, not at the will of outsiders. (*Pacific Gas & Electric Co. v. Bear Stearns & Co., supra*, 50 Cal.3d at p. 1127, 270 Cal.Rptr. 1, 791 P.2d 587; *Speegle v. Board of Fire Underwriters*  29 Cal.2d 34 (1946), 39, 172 P.2d 867.)

*Reeves* at 1148.

### 2) This Was Not an At-Will Contract at the Time It Was Disrupted

189.    Factually, an at-will contract can be terminated by either party at any time, but this was not an at-will contract at the time it was disrupted. At the time of this attempted disruption, there was no power for either party to terminate because a motion was before the New York Supreme court within a few days of a hearing and De La Huerta had not identified either a substitution with another law firm or permission for the court for the client to become pro-se with a motion pending was required.

190.    The focus of the issue is not a mere technicality. In at will contract – particularly for the purposes of this tort analysis – a disruption causes an interference with an expectancy rather than a required performance. Here, the disruption did not relieve Tensor Law from its duty to appear in New York Supreme Court to argue this motion – performance was still due. A failure to appear by Tensor Law with result of the public release of the Clients very personal records would clearly subject Tensor Law to liability for breach of duty. In particular, throughout the Lionsgate litigation, TLPC was obligated to assure that no emotional distress cause of action could be pled that would put her psychotherapy records at issue and make them discoverable. This obligation continued although RUBINS actions made this duty more difficult to perform.

191.     The typical model for an at-will contract is in the employment setting wherein an employee is paid for work performed and then terminates employment. The contract of employment is ended and neither party has a resort to require further performance of the duties. Here, however, no payment for services had taken place, so that significant performance by De La Huerta was pending. From that perspective this is additionally a fee dispute wherein a third party – RUBIN – is inducing a breach of performance by one party, as opposed to a repetitively completed contract from which both parties can walk away, leaving only future potential expectancy as unfulfilled. For all of these reasons, this is not the species of interference wherein termination of an at will contract affects a mere expectancy, but rather it is a disruption that affects continuing duties to perform as to both parties. It additionally makes the collection of any payment due to TLPC more burdensome by, e.g. requiring a first law firm to sue an intervening second law firm to obtain quantum meruit payment for services and reimbursement of costs as opposed to executing an agreed apportionment upon funds in a trust account.

**F) RUBIN's Actions Resulted in a Break in Contract**

*1) Causation is Readily established for Making the Objective of Obtaining an Indictment of WEINSTEIN More Difficult as Well as Less Likely*

192.     The fifth element of the cause of action (5) is the demonstration of **resulting damage**. This element raises two issues, firstly there is the appropriate means of identifying causation and secondly there is the question of what sort of damages are actionable once the first four elements and causation are established.

193.     The standard for causation under California law in cases of intentional interference with contractual relations is articulated in *Bank of New York v. Fremont*:

California employs the "substantial factor" test for determining causation  in intentional  torts cases. *See Franklin v. Dynamic Details, Inc.*, 116 Cal.App.4th 375, 10 Cal.Rptr.3d 429, 441 (2004) (applying the substantial factor test in an intentional interference  with contractual relations action and noting that "a cause of ... damage ... is something that is a substantial

factor in bringing about ... damage"). "The substantial factor standard generally produces the same results as does the 'but for' rule of causation which states that a defendant's conduct is a cause of the injury if the injury would not have occurred 'but for' that conduct." *Rutherford v. Owens-Illinois, Inc.*, 16 Cal.4th 953, 67 Cal.Rptr.2d 16, 941 P.2d 1203, 1214 (1997) (citing *Mitchell v. Gonzales*, 54 Cal.3d 1041, 1 Cal.Rptr.2d 913, 819 P.2d 872, 879 (1991) ). California law defines "substantial" expansively, and at least one court has cautioned against placing "undue emphasis" on the ordinary meaning of that word. *Rutherford*, 67 Cal.Rptr.2d 16, 941 P.2d at 1214.  Although "a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about injury, damage, or loss is not a substantial factor," the substantial factor test is a "broader rule of causality than the 'but for' test." Id.  (citing *People v. Caldwell*, 36 Cal.3d 210, 203 Cal.Rptr. 433, 681 P.2d 274, 280 (1984) ; *Prosser & Keeton on Torts* (5th ed.1988 supp.) § 41, pp. 43-44); see also *U.S. Fid. & Guar. Co. v. Am. Employer's Ins. Co.*, 159 Cal.App.3d 277, 205 Cal.Rptr. 460, 465 (1984)  ("The critical question as to causation in intentional torts is whether the actor's conduct is a substantial factor in bringing about the type of harm which he intended from his original act. [N]o consideration is given to the fact that after the event it appears highly extraordinary that it should have brought about such harm or that the actor's conduct has created a situation harmless unless acted upon by other forces for which the actor is not responsible") (quoting *Tate v. Canonica*, 180 Cal.App.2d 898, 5 Cal.Rptr. 28, 35 (1960)) (internal citations and some punctuation omitted).

*Bank of New York v. Fremont General* 523 F.3d 902, 909 (9th Circuit 2008).

194.    Here, TLPC alleges that causation and harm are readily and actually shown. After five years of cooperative effort between FILLER and De La Huerta – RUBIN brought about a termination of representation directly through and as the purpose of his interference. Indeed, RUBIN's sole purpose was to deny De La Huerta access to her extremely effective counsel for the purpose of aiding WEINSTEIN. Whether the relationship between RUBIN and WEINSTEIN or with TWC is a) as co-conspirators or b) as Undisclosed Principal and Agent; or if RUBIN in breaking the representation, c) simply hoped to collect a fee from WEINSTEIN or from TWC if he could damage the case; and or to d) obtain the psychotherapy records to sell to WEINSTEIN's defense counsel is immaterial to RUBIN's liability, or whether RUBIN acted on his own personal disdain for De La Huerta's cause of action is ultimately immaterial as to intent and causation in relation to the tort of interference with contractual relations.

195.    Causation in California is according to a principle of a "substantial factor" analysis that is somewhat different from the "proximate cause" standard in use in other jurisdictions in that also incorporates the "but for" analysis, see *Mitchell v. Gonzales,* 54 Cal.3d 1041, 1052 (1991). Here, the "but for" analysis has four prongs – firstly: extensive reliance of De La Huerta upon

-86-

VERIFIED COMPLAINT of Tensor Law P.C. vs. Michael Rubin, Harvey WEINSTEIN, et al

TLPC and Filler across many years and in many circumstances – secondly: an extremely high level of success by TLPC with the objectives of De La Huerta in this WEINSTEIN matter at the time of termination – thirdly: continued reliance of De la Huerta on TLPC for other matters after the termination re-WEINSTEIN –and fourth: RUBIN's role as the sole source of aggressive legal advice to De La Huerta that TLPC – was a) wrongly communicating to the press, that TLPC was b) wrongly practicing in New York, that TLPC was c) wrongly protecting her records from the DA's subpoena and that it was extremely important d) to urgently and immediately terminate TLPC so that RUBIN could gain physical possession of the psychotherapy records for the purpose of carrying them personally to Spain.

196.    Proximate cause is shown clearly in the email exchange between RUBIN and De La Huerta shown at figure 5 *supra*. RUBIN directs De La Huerta to provide a release to Hillowe so that he can give an extra copy to RUBIN. De La Huerta immediately does as she is directed by RUBIN even though this would have caused a severe and irreparable harm by waiving her privilege against discovery of her psychotherapy records – an outcome that she did not desire, did not understand and which she had labored extensively to avoid over many years. The level of confidence and control RUBIN had developed with De La Huerta is well shown and in this example it is readily shown that RUBIN proximately caused her to take this action. Further, because at this time, Filler was actually still counsel in this matter and it was still Filler's duty to protect De La Huerta's records, this proximately caused action did directly interfere with Filler's performance of his contractual duties. The confusion engendered by this pattern of De La Huerta taking this order directly from RUBIN demonstrates how he was able to direct her to actually terminate TLPC's representation of De La Huerta in this matter.

*2) The Amount of Pecuniary Damages is Susceptible to Being Accurately Established*

197.    The damages that are actionable arise from both the contractual and the tortious aspects of this cause of action:

"The measure of damages for intentional interference  with contractual relations or prospective economic advantage is "an amount that will reasonably compensate plaintiff for all loss or

harm, providing that you find it was [or will be] suffered by plaintiff and caused by the defendant's conduct." (*BAJI* No. 7.89 ; see also *Youst v. Longo* (1987) 43 Cal.3d 64, 71, fn. 6, 233 Cal.Rptr. 294, 729 P.2d 728 [damages for interference with prospective economic advantage are "economic harm to the plaintiff proximately caused by the acts of the defendant"].) The amount of such harm or loss includes "[t]he financial loss of the benefits of the [contract] [or] [the prospective economic relationship]." FN7  (*BAJI* No. 7.89.) FN7. *BAJI* No. 7.89  is derived from the *Restatement Second of Torts*, section 774A, which states, in relevant part: "(1) One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for [¶] (a) the pecuniary loss of the benefits of the contract or the prospective relation; [¶] (b) consequential losses for which the interference is a legal cause; and [¶] (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference." (See *Di Loreto v. Shumake* (1995) 38 Cal.App.4th 35, 38–39, 45 Cal.Rptr.2d 22.)  The *Restatement Second of Torts* recognizes a proper plaintiff may recover lost profits when a third person is prevented from performing a contract with that plaintiff and, on a claim for interference with prospective economic advantage, may recover the lost profits to have been made out of the expected contracts. (*Rest.2d Torts*, § 774A , com. b, p. 55.)

*Sole Energy Company et al v. Petrominerals Corporation et al,* 128 Cal.App.4th 212, 232-233; 26 Cal.Rptr.3d 798 (2005).

198.    In regard to WEINSTEIN, success in the criminal case was required in order to proceed with the civil case. Thus, disruption of the criminal case interfered with the ability of TENSOR LAW P.C. to obtain a contingency fee. TENSOR LAW P.C. has been prepared to allege that De La Huerta suffered pecuniary harm because WEINSTEIN played a roll in causing De La Huerta to be terminated off of her then active HBO series Boardwalk Empire which termination at the end of the second of the five seasons of the series, followed closely upon her accusation to WEINSTEIN in January of 2011 that he was a rapist. Note that these damages arise because it is alleged that WEINSTEIN 1) took punitive and retaliatory action against De La Huerta in response to her accusations and denunciations and 2) that De La Huerta's public displays of distress resulting from the confrontations (e.g. the Chateau Marmont episode of January 17, 2011) led to her termination – thus the damages do not rely on criminal proof of the assault nor do they necessarily rely on proof of retaliation.

199.    On information and belief, the financial harm of being terminated off of Boardwalk Empire constituted a loss of income and loss of future work valued at $5 million. The termination occurred while De La Huerta was receiving wide spread acclaim for her role in that

series. Whether the termination was a result of a retaliatory act by WEINSTEIN or whether the termination was due to psychological damage and deterioration suffered and publicly demonstrated by De La Huerta commencing in January of 2011 in consequence of the interaction with Weinstein, these constitute a separate basis for determining the potential value of recovery from a civil litigation in the mater of WEINSTEIN and De La Huerta.

200.    In addition, although De La Huerta was injured on the set of "Nurse" – a Lionsgate production – in 2011, California courts may find that the subsequent substantial collapse of her film career was not due to the Lionsgate injury. If that fact is established, then De La Huerta would have looked to WEINSTEIN for the substantial cause of these career harms which she has valued at $55 million in her action against Lionsgate. To the extent that RUBIN's interference caused TENSOR LAW PC to lose its contingency fee on $60 million of liabilities, a typical or conservative 33% contingency rate results in damage of $20 million to Tensor Law PC directly attributable to RUBIN's actions.

201.    In addition Plaintiff suffered consequential damages in being forced to expend in funds to bring this current suit:

> "A person who through the tort of another  has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures thereby suffered or incurred. (*Stevens v. Chisholm*, 179 Cal. 557 (1919), 564 [178 P. 128] (1919); *Nelson v. Kellogg*, 162 Cal. 621 (1912) , 623 [123 P. 1115 , Ann.Cas. 1913D 759]; *Contra Costa County Title Co. v. Waloff*, 184 Cal.App.2d 59 (1960), 67  [9a] [7 Cal.Rptr. 358] ; *Rest., Torts* (1939) § 914; 15 Am.Jur. (1938) Damages, § 144, p. 552; 25 C.J.S. (1941) Damages, § 50c, p. 534; *cf. Estate of Williamson, supra*, 150 Cal.App.2d 334 (1957), 341.)

*Prentice v. North American Title Guaranty Corp*, 59 Cal. 2d 618, 620 (1963). Thus any attorneys fees incurred will be sought as well along with punitive damages.

202.    Further, it is alleged that TLPC suffered actual determinable pecuniary harm by the loss of ability to collect it's non-contingent quantum meruit costs encountered in the representation of  De La Huerta in the WEINSTEIN matter because of the loss of goodwill and interference of RUBIN's attack on its representation of De La Huerta.

**G. Direction by an Undisclosed Principal to Interfere with Contractual Relations**

*1) Allegation of Undisclosed Principal Status for WEINSTEIN and/or THE WEINSTEIN COMPANY*

203.    Plaintiff further alleges a possible status of undisclosed principal as to WEINSTEIN's relationship with or TWC's relationship with RUBIN as distinct from conspiracy

> Civil conspiracy is "a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. [Citation.] By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. [Citation.] In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd., supra*, 7 Cal.4th 503, 510 (1994)–511, 28 Cal.Rptr.2d 475, 869 P.2d 454 .)

*American Master Lease LLC v. Idanta Partners LTD*, 225 Cal.App.4th 1451, 1473 (2014).

204.    Here there is no discernible personal motive for RUBIN to interfere with and disrupt the contractual relations which were intended to accomplish a criminal indictment of Harvey WEINSTEIN. Often, interference with contract is done for competitive reasons, but in this case, RUBIN took care to assure that he never developed an attorney-client relationship with De La Huerta and ultimately advised her she had no case and should withdraw her claim against WEINSTEIN. These actions place RUBIN's law license in jeopardy because he appears to have obtained confidences from De La Huerta under her mistaken belief that RUBIN was trying to aid her objectives when in fact he was trying to prevent her from achieving her objectives. These confidences were then shared with a third party. He acted to create a waiver that would  place all of her personal therapy records in a position of exposure and availability to WEINSTEIN and potentially to the entire public, while attempting to convince her to drop the case. Immediately after interfering and undermining FILLER, RUBIN proceeded to interfere with and undermine Goldberg who was then trying to advance the case.

205.    WEINSTEIN has been shown to have expended millions of dollars to prevent any case such as De La Huerta's from emerging and proceeding. He managed to retain David Boies to undermine and intimidate New York Times reporters, even while Boies was retained by the New

-90-

VERIFIED COMPLAINT of Tensor Law P.C. vs. Michael Rubin, Harvey WEINSTEIN, et al

York Times. This modus operandi is consistent with what WEINSTEIN sought to achieve with RUBIN as to De La Huerta. Because a criminal conviction would have devastating impact on WEINSTEIN and greatly disadvantage him in a hundred other civil actions against him, he will have placed a very high financial value on disrupting and defending against the criminal conviction against him sought by De La Huerta.

206.    THE WEINSTEIN COMPANY devised arrangements to intimidate victims of sexual harassment and to discourage them from proceeding against WEINSTEIN. Common purpose with WEINSTEIN and RUBIN is established by these actions. Therefore, Undisclosed Principal, or conspiracy or, where applicable, aiding and abetting of interference, bring DOES 1 to 10 – through whom RUBIN conveyed *to* WEINSTEIN and THE WEINSTEIN COMPANY and DOEs 11 to 20 – through whom RUBIN received commitments of benefits *from* WEINSTEIN and THE WEINSTEIN COMPANY into this cause of action. These DOES are thus defendants alongside their contact, retained attorney, or potential vendor of stolen information – RUBIN. This is equally true if RUBIN was an agent's agent and whether or not he ever met personally with WEINSTEIN or ever had any direct discussion with WEINSTEIN.

*2) The Existence of Agency Can Be Implied By Conduct*

207.    Establishment of the existence of Agency is detailed in California Civil Jury Instruction §3705. Under California law:

> The creation of an agency relationship is not dependent upon the existence of a written agreement. The relationship may be implied based on conduct and circumstances (*Thayer v. Pacific Elec. Ry. Co*. (1961) 55 Cal.2d 430, 438, 11 Cal.Rptr. 560, 360 P.2d 56 ; *Pollack v. Lytle* (1981) 120 Cal.App.3d 931, 940, 175 Cal.Rptr. 81 ),

*Scholastic Book Clubs Inc. v. State Bd. Of Equalization* 207 Cal.App.3d 734, 738 (1989), and see also *Michelson v. Hamada* 29 Cal.App.4th 1566,1579 (1994) ("Agency may be implied from the circumstances and conduct of the parties") citing to *Bergtholdt v. Porter Bros Co*. 114 Cal. 681 (1896).

> Where circumstantial evidence is resorted to for the purpose of establishing an agency, all the facts and circumstances showing the relation of the parties, and throwing light upon the

character of such relation, are admissible in evidence.

*Bergtholdt* at 688. See also *Smith v. Schuttpelz* 1 Cal.2d 158 (1934):

The relation of agency need not depend upon express appointment and acceptance thereof, but it may be, and frequently is, implied from the words and conduct of the parties and the circumstances of the particular case.

*Smith v. Schuttpelz* at 161.

208.    Here, the actions of RUBIN are tortious and violate the American Bar Association Model Rules, the New York Bar Association Rules of Professional Ethics and California Rules of Professional Conduct. A knowledgeable experienced attorney would know of the high jeopardy to his career resulting from these acts, yet these acts appear to have little or no potential benefit to RUBIN himself. In general commercial transactions, the true beneficiary of the acts of an agent with an undisclosed principal may be difficult to determine or prove – this is the situation in some cases of undisclosed principal wherein several fruit buyers are acting in concert to affect prices, but it is difficult to prove which larger entity may be uniquely benefiting, because there are many potential beneficiaries. However, here, the objective and potential gain from the acts undertaken are only to impede and impair a criminal prosecution of a single person – Harvey Weinstein and possibly The Weinstein Company. Further there is valid grounds for admitting facts as circumstantial evidence that Weinstein himself hired attorneys to attempt to subvert and interfere with efforts to prove sexual assaults by other accusers such as Rose McGowan.

209.    Thus with the pattern of activity provable for this very class of unusual conduct by WEINSTEIN (retaining an attorney to conduct sub-rosa acts to gain the confidence of an accuser for purposes of disrupting the accusers ability to act against him), with the motive attributable to only WEINSTEIN and/or – to  a slightly lesser extent - to THE WEINSTEIN COMPANY and with the facts of the actions to subvert the advancement of the De La Huerta case towards an indictment, a reasonable attorney, and indeed any court could readily conclude that RUBIN acted as the agent of WEINSTEIN or of THE WEINSTEIN COMPANY.

### H. Summary As To Intentional Interference With Contractual Relations

210.    As a direct and proximate result of Defendants unlawful conduct, Plaintiff has suffered economic harm and other consequential damages all in an amount according to proof at trial.

211.    The acts of Defendants, as alleged herein were willful, wanton, and malicious and were intended to oppress and cause injury to Plaintiff. In light of the willful, wanton, malicious and intentional conduct engaged in by Defendant, Plaintiff is entitled to an award of punitive damages.

212.    Alternatively to conspiracy, however, Plaintiff alleges that – subject to proof – Harvey WEINSTEIN or THE WEINSTEIN COMPANY were the Undisclosed Principal, and will elect among RUBIN as principal or WEINSTEIN as principal or TWC as principal upon such proof or at the necessary time of election, *see Klinger, supra; Luce, supra; Schnier, supra; and Patterson, supra*.

### I. Exemption and Immunity as to any Anti-SLAPP Special Motion to Strike Under Cal CCP §425.16

213.    This litigation asserts exemption, immunity and inapplicability as to California Code of Civil Procedure §425.16 on three grounds. Firstly, under a setting of simultaneous adverse representation – no protected litigation privilege exists, see *Coretronic Corporation v. Cozen O'Connor,* 192 Cal.App.4th 1381, 1392 (2011). Simultaneous adverse representation is fully and adequately pled herein. In such actions, it is the intentional provision of a false appearance of fiduciary duty that is the interference making TLPC's representation more burdensome and not any actual attorney work, see *California Back Specialists Medical Group v. Rand,* 160 Cal.App.41th 1032, 1037 (2008) and *Benasra v. Mitchell Silberberg & Knupp LLC*, 123 Cal.App.4th 1179, 1189 (2004).

214.    Secondly, the first count of interference complains of an effort to obtain confidential records. This is a physical action and the fact that speech and writing were used in the attempt to obtain a physical copy of the records does not make that attempt an exercise of

-93-

1   protected speech. The action is for a wrongful effort to obtain confidential information and is not

2   directed at the speech or communication per se which is only incidental. The breach in fiduciary

3   duty to De La Huerta which automatically arises in the setting of an adverse representation is also

4   not a communicative act itself, nor is the interference with contract, see *Okorie v. Los Angeles*

5   *Unified School District,* 14 Cal.App.5[th] 574, 586 (2017).

6       215.    Thirdly, Plaintiff TLPC is exempt under the public interest exception in that it

7   hereby provides that all financial benefit from this action will be donated to the public in a

8   50%/50% split between the Times Up Campaign and the sexual assault victim Paz De La Huerta

9   who's rights the Principal defendant in this matter sought to tamper with both by and through

10  RUBIN's actions. Specifically, as outlined at *Tourgeman v. Nelson & Kennard* 222 Cal.App.4[th]

11  1447, 1458-1459 (2014), the action is brought solely in the public interest to expose and prevent

12  further use of the WEINSTEIN modus operandi of using former Assistant District Attorneys and

13  intelligence units such as K2 Intelligence and Black Cube to intimidate, humiliate and deny rights

14  as to sexual assault accusers, while pressuring any District Attorney not to seek indictments for

15  such assaults. Success in this  action will confer a significant benefit on the public – here, not

16  only the scores of individuals affected by Weinstein, but many others who have been so

17  intimidates as to avoid coming forward to assert their rights or seek justice. Private enforcement

18  was necessary because the actionable means of misbehavior through which rights were denied

19  was by interference with a contract by the offending third party. Private enforcement placed a

20  disproportionate burden on the plaintiff because of the need for a party with an actionable harm to

21  proceed to seek redress. The Plaintiff has standing because the Plaintiff is uniquely affected by

22  the particular interference complained of, see e.g. *Weiner v. City of Los Angeles,* 68 Cal.2d 697,

23  706 (1968). All of this is in addition to the fact that this complaint does make an adequate prima

24  facie case for success of its cause of action.

25

26  ### VI. SECOND CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH A

27  ### PROSPECTIVE ECONOMIC ADVANTAGE

28  **(as against RUBIN, alternatively upon election against any Undisclosed Principal**

**& against DOES 1 to 50)**

216.    Plaintiff realleges and incorporates by reference as though fully set forth herein, each and every allegation set forth above in this Complaint.

217.    To the extent that a court may find that the business relations between Tensor Law PC and Paz De La Huerta do not constitute contractual relations, the same assertions made in cause of action for Tortious Interference with Contractual Relations are realleged, restated, and reasserted here.

**VII. THIRD CAUSE OF ACTION: PRACTICING LAW WITHOUT A LICENSE –**

**VIOLATION OF CAL. BUSINESS & PROFESSIONAL CODE §6126**

**(As Against Defendant RUBIN)**

218.    Plaintiff realleges and incorporates by reference as though fully set forth herein, each and every allegation set forth above in this Complaint.

219.    Routine contacts between attorneys in different states is necessary in many situations to reasonably conduct routine activities. However, in the current matter, RUBIN called into the law offices of Tensor Law PC and gave a series of orders and directions to FILLER affecting both New York and California matters. These actions constituted the practice of law without a license in violation of California Business and Professional Code §6126.

220.    RUBIN informed Filler – falsely – that FILLER has been terminated as counsel, he informed falsely that he was an attorney representing De La Huerta, he sought information from FILLER in relation to a pending court filing, he ordered Filler to halt or withdraw the legal filing. The fact that the filing was for a New York Court does not change the fact he was materially attempting to direct and control actions of attorneys in California. The order for termination of legal action from RUBIN to FILLER also included a Complaint for Sexual Harassment by De La Huerta against Harvey WEINSTEIN for events in California, which had

VERIFIED COMPLAINT of Tensor Law P.C. vs. Michael Rubin, Harvey WEINSTEIN, et al

been drafted but not yet filed.

## VIII. PRAYER FOR RELIEF

1. General damages in an amount to be shown according to proof at the time of trial.

2. Special damages in an amount to be shown according to proof at the time of trial.

3. Punitive and exemplary damages in an amount appropriate to punish or se an example of Defendant.

4. Cost of Suit.

5. Such other and further relief as this court deems just and proper.

Date:   February 22, 2018                    Chanel Katiraie, Esq.

Aaron G. Filler, Esq.

By: _Chanel Katiraie_

Chanel Katiraie, Esq.

Aaron G. Filler, Esq.
Chanel Katiraie, Esq.
TENSOR LAW PC

Attorneys for Plaintiff, TENSOR LAW, PC

VERIFIED COMPLAINT of Tensor Law P.C. vs. Michael Rubin, Harvey WEINSTEIN, et al

1

2

## **DEMAND FOR JURY TRIAL**

3

4          Plaintiff hereby demands a jury trial in this action.

5

6

7   Date:   February 22, 2018                    Chanel Katiraie, Esq.

8                                                Aaron G. Filler, Esq.

9

10                                               By: _Chanel Katiraie_

11                                               Chanel Katiraie, Esq.

12                                               Aaron G. Filler, Esq.
13                                               Chanel Katiraie, Esq.
                                                 TENSOR LAW PC
14                                               Attorneys for Plaintiff, TENSOR LAW, PC

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED COMPLAINT of Tensor Law P.C. vs. Michael Rubin, Harvey WEINSTEIN, et al

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

VERIFICATION

I declare that:

I have read the VERIFIED COMPLAINT filed by Tensor Law PC in Case: titled: TENSOR LAW PC v. MICHAEL F. RUBIN, an individual; HARVEY WEINSTEIN, an individual; THE WEINSTEIN COMPANY, K2 INTELLIGENCE LLC; LINDA FAIRSTEIN; BC STRATEGY UK LTD and DOES 1-50, having the following causes of action: (1) Intentional Interference with Contractual Relations; (2)    Intentional Interference with Prospective Economic Advantage; (3) Practicing Law Without A License – Violation Of Cal. Business & Professional Code §6126 and understand its contents.

☒ I am the Person Most Knowledgeable for a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and to those matters I believe them to be true. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

☐ I am a party to the above entitled action. The matters stated in the document described above are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐ I am one of the attorneys for _____, a party to this action. Such party is absent from the county of aforesaid where such attorney's have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on February 22, 2018 at Santa Monica, California.

I declare under penalty of perjury under the laws of the State of California, of the State for New York, and of the United States of America that the foregoing is true and correct.

Aaron G. Filler

_____,          _____
Type or Print Name                              Signature

-97-

VERIFIED COMPLAINT of Tensor Law P.C. vs. Michael Rubin, Harvey WEINSTEIN, et al